[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 22-13569

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

MARION MICHAEL O'STEEN,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 3:21-cr-00016-MMH-JBT-2

_____

Before JORDAN, LAGOA, and TJOFLAT, Circuit Judges.

TJOFLAT, Circuit Judge:

This appeal is the last chapter of a lengthy FBI investigation of the State Attorney for the Third Judicial Circuit of Florida,[1] Jeffrey Alan Siegmeister. The investigation began in August 2018, after Andy Tong, whom Siegmeister was prosecuting for maintaining a gambling house in violation of Florida law,[2] told the FBI that his attorney, Marion Michael O'Steen, would have to pay Siegmeister $50,000 for a favorable disposition of the case. The investigation concluded in February 2021, when a Middle District of Florida grand jury returned a twelve-count indictment against Siegmeister and O'Steen. Siegmeister was charged in eleven counts, O'Steen in four. Relevant here are Counts One through Four.[3]

---

[1] The Third Judicial Circuit consists of seven counties: Columbia, Dixie, Hamilton, Lafayette, Madison, Suwannee, and Taylor.

[2] Siegmeister charged Tong and two of his associates with violating Florida Statute § 849.01, a third-degree felony punishable by imprisonment for a term of up to five years.

[3] Not relevant are the eight counts that were lodged only against Siegmeister. Count Five: Siegmeister conspired with a defense attorney (not O'Steen), in violation of 18 U.S.C. § 371, to commit bribery concerning programs receiving federal funds in violation of 18 U.S.C. § 666(a)(1)(B). Count Six: Siegmeister committed the § 666(a)(1)(B) bribery offense referred to in Count Five. Counts Seven through Nine: Siegmeister defrauded an elderly man with physical and mental deficiencies for whom he had been appointed guardian of Coca-Cola common stock worth $664,751, in violation of 18 U.S.C. § 1343. Siegmeister used part of the proceeds of the sale of the stock to purchase a 70-acre farm on which he raised Braford bulls for breeding. Counts Ten through Twelve: Siegmeister filed false federal income tax returns for 2015, 2016, and 2017, in violation of 26 U.S.C. § 7206(1).

Count One alleged that Siegmeister and O'Steen conspired from January 16, 2013, through December 19, 2019, to engage in bribery and extortion in violation of Florida law.[4] Count Two alleged that they conspired from August 9, 2018, through May 16, 2019, to obtain $60,000 from Andy Tong, an O'Steen client,[5] through extortion and extortion under color of official right in violation of the Hobbs Act.[6] Count Three alleged that Siegmeister and O'Steen, aiding and abetting each other, achieved the object of the Count Two conspiracy: they obtained $60,000 from Andy Tong

---

[4] Count One alleged that the defendants conspired in violation of 18 U.S.C. § 371 to violate 18 U.S.C. § 1952(a)(3), prohibiting interstate and foreign travel or transportation in aid of racketeering enterprises, by engaging in bribery and extortion in violation of Florida Statutes §§ 838.015 (bribery) and 836.05 (extortion).

[5] The indictment alleged that the defendants "obtained property not due defendants from Client B." The property was $60,000, and Client B was Andy Tong.

[6] 18 U.S.C. § 1951, commonly referred to as the Hobbs Act, states in relevant part:

(a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by . . . extortion . . . shall be fined under this title or imprisoned not more than twenty years, or both.

(b) As used in this section—

. . .

(2) The term "extortion" means the obtaining of property from another, with his consent, [1] induced by wrongful use of actual or threatened force, violence, or fear, or [2] under color of official right.

through extortion and extortion under color of official right in violation of the Hobbs Act.[7] Count Four, brought against O'Steen alone, alleged that on or about August 23, 2018, he failed to file Form 8300 with the Financial Crimes Enforcement Network within fifteen days after he received more than $10,000 in one business transaction.[8]

At arraignment, the defendants entered pleas of not guilty as charged. Over a year later, Siegmeister entered into a plea agreement with the Government and pled guilty to Counts One, Two, Seven and Ten of the indictment.[9] On June 6, 2022, O'Steen stood trial on Counts One through Four. Siegmeister testified for the

---

[7] Count Three alleged violations of 18 U.S.C. §§ 1951(a) and 2. Section 2 states that "[w]hoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal." As in Count Two, Count Three alleged that the defendants "obtained property not due defendants from Client B." We treat Counts Two and Three throughout as alleging that the defendants obtained $60,000 from Andy Tong.

[8] *See* 31 U.S.C. §§ 5331 (reports relating to coins and currency received in nonfinancial trade or business) and 5322 (criminal penalties).

[9] Siegmeister remained subject to prosecution on the remaining counts of the indictment, Counts Three (from which he had been severed), Five, Six, Eight, Nine, Eleven and Twelve. The plea agreement called for the dismissal of those counts at Siegmeister's sentencing provided that Siegmeister satisfactorily cooperated with the Government and, among other things, testified as a prosecution witness at O'Steen's trial.

prosecution. On January 15, the jury found O'Steen not guilty on Counts One and Two and guilty on Counts Three and Four. The District Court sentenced O'Steen to concurrent prison terms of 44 months on those counts, to be followed by a three-year period of supervised release, and ordered him to pay a fine of $45,000 and make restitution to the United States of $60,000.

O'Steen appeals his convictions. The offenses alleged in Counts Three and Four are materially unrelated, involve different factual predicates, and are subject to different standards of review. We consider them separately.

## I.  The Count Three Appeal

We organize our discussion of this appeal as follows: Part A addresses the offenses Count Three presents. Part B highlights the significant pretrial defense motions and their dispositions. Part C covers the trial of Count Three. Part D deals with submission of Count Three to the jury and their verdict. Part E states the issues on appeal. In Part F, we discuss the issues, conclude that affirming the Count Three conviction would be improper, and accordingly set it aside.

*A*

Count Three alleged that on or about August 9, 2018, through May 16, 2019, in violation of 18 U.S.C. §§ 1951(a) and 2,

> the defendants, JEFFREY ALAN SIEGMEISTER and MARION MICHAEL O'STEEN, aiding and abetting each other, did knowingly obstruct, delay, and affect, and attempt to obstruct, delay, and affect . . .

commerce . . . by extortion, as such terms are de-
fined in 18 U.S.C. § 1951, that is, the defendants, act-
ing in concert with one another, obtained property
[i.e., $60,000] not due defendants, from [O'Steen]
Client [Andy Tong], with [Andy Tong's] consent, un-
der color of official right and through fear of eco-
nomic harm.

In Count Three, the grand jury took two inconsistent, irrec-
oncilable positions, and the Government did so in the instructions
it persuaded the District Court to give to the jury. One position was
that O'Steen, as principal, obtained Tong's $60,000 by extortion and
extortion under color of official right, and Siegmeister, as accom-
plice, assisted O'Steen in committing the offenses. The other posi-
tion was that Siegmeister, as principal, obtained Tong's $60,000 by
both extortion and extortion under color of official right and
O'Steen, as accomplice, assisted Siegmeister in committing the of-
fenses. This accounts for the jury's bifurcated findings on Count
Three: O'Steen, as principal, committed or, as an accomplice, aided
and abetted Siegmeister as principal to commit, both extortion and
extortion under color of official right.

Count Three was duplicitous in that it alleged eight separate
offenses.[10] As such, it was framed in violation of Rule 8(a) of the

---

[10] "Duplicity is the joining in a single count of two or more distinct and sepa-
rate offenses." *United States v. Starks*, 515 F.2d 112, 116 (3d Cir. 1975). This
"should be distinguished from multiplicity, the charging of a single offense in
several counts, and from misjoinder, the inclusion in separate counts of an
indictment of offenses or defendants not permitted by" Rule 8. *Id.* at 116 n.5;
*Bins v. United States*, 331 F.2d 390, 392 (5th Cir. 1964). We adhere to the analysis

22-13569　　　　　　　　Opinion of the Court　　　　　　　　　7

Federal Rules of Criminal Procedure.[11] The defendants could have moved the District Court before trial pursuant to Rule

in *Bins*. *See United States v. Schlei*, 122 F.3d 944, 979 (11th Cir. 1997). "[I]t is well settled that the test for determining whether several offenses are involved is whether identical evidence will support each of them, and if any dissimilar facts must be proved, there is more than one offense." *Bins*, 331 F.2d at 393 (citing *Blockburger v. United States*, 284 U.S. 299, 52 S. Ct. 180 (1932)). Duplicity implicates constitutional concerns. One vice of duplicity is the denial of the defendant's Sixth Amendment right to knowledge of the charges against him. Under a duplicitous indictment or count, the jury will consider two crimes, creating the risk that the jury might convict without reaching a unanimous agreement on either crime. We would not know whether a unanimous verdict was reached because a general jury verdict on a single count "does not reveal whether the jury found the defendant guilty of one crime and not guilty of the others, or guilty of all of them." *Bins*, 331 F.2d at 392. Another vice concerns the defendant's Fifth Amendment protection against double jeopardy. "[A] general verdict for a defendant on the [duplicitous] count does not reveal whether the jury found [the defendant] not guilty of one crime or not guilty of both." *Starks*, 515 F.2d at 116. That uncertainty could prejudice the defendant's exercise of the right not to be exposed to double jeopardy. *Id.* This is due to "a lack of clarity concerning the offense for which he is charged or convicted." *United States v. Aguilar*, 756 F.2d 1418, 1420 n.2 (9th Cir. 1985).

[11] Rule 8(a) of the Federal Rules of Criminal Procedure, Joinder of Offenses or Defendants, states:

> The indictment or information may charge a defendant in separate counts with 2 or more offenses if the offenses charged . . . are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan.

12(b)(3)(i)(b)[12] to enter an order requiring the Government to separate Count Three's offenses into eight separate counts.[13] But the defendants did not take that step, opting instead to try Count Three as alleged. We posit what separate counts would have alleged. We refer to the counts in bold type to avoid confusing them with the indictment's counts as our discussion proceeds.

- **Count 1**: Siegmeister obtained Tong's money through extortion.

- **Count 2**: Siegmeister obtained Tong's money by extortion under color of official right.

- **Count 3**: O'Steen obtained Tong's money through extortion.

---

[12] Rule 12(b)(1) of the Federal Rules of Criminal Procedure states: "A party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits." And Rule 12(b)(3)(B)(i) states:

> The following defenses, objections, and requests must be raised by pretrial motion if the basis for the motion is then reasonably available and the motion can be determined without a trial on the merits . . . a defect in instituting the prosecution, including . . . joining two or more offenses in the same count (duplicity).

[13] Based purely on the indictment, Count Three could be interpreted to allege even more counts based on its "attempt" language. However, the Government never requested that the jury be instructed on attempt theories, and no such instruction was given by the District Court. Accordingly, here and throughout this opinion, we treat Count Three as effectively having alleged only the substantive offenses of extortion and extortion under color of official right.

- **Count 4**: O'Steen obtained Tong's money by extortion under color of official right.

- **Count 5**: Siegmeister aided and abetted O'Steen's extortion.

- **Count 6**: Siegmeister aided and abetted O'Steen's extortion under color of official right.

- **Count 7**: O'Steen aided and abetted Siegmeister's extortion.

- **Count 8**: O'Steen aided and abetted Siegmeister's extortion under color of official right.

To find O'Steen guilty of **Count 7**, the jury would have to find as a threshold element of the offense beyond a reasonable doubt that Siegmeister committed the **Count 1** offense. Similarly, to find O'Steen guilty of **Count 8**, the jury would have to find beyond a reasonable doubt that Siegmeister committed the **Count 2** offense.

B

The grand jury returned the indictment in this case on February 24, 2021. At his arraignment on February 26, O'Steen appeared with counsel and pled guilty as charged. Siegmeister, arraigned on April 22, also pled not guilty as charged. He requested the appointment of counsel.

On December 21, 2021, the Government disclosed the report of its expert witness, Scott Richardson, a Florida lawyer specializing in the practice of criminal law. As indicated in his report,

Richardson was prepared to testify that that the $60,000 O'Steen obtained from Andy Tong in the form of an attorney's fee to represent him in his gambling case was excessive and contingent in violation of the Rules Regulating the Florida Bar.

On February 22, 2022, Siegmeister appeared before a magistrate judge and, pursuant to a plea agreement, tendered pleas of guilty to Counts One, Two, Seven, and Ten of the indictment. The magistrate judge found that the pleas were given knowingly and voluntarily and were factually supported. The magistrate judge recommended that the District Court accept the pleas.

On April 1, O'Steen moved the District Court to sever Count Four from Counts One through Three of the indictment on the ground that "Count Four is not of the same or similar character as the other charged offenses." The same day, he moved the District Court *in limine* to exclude under Rule 403 of the Federal Rules of Evidence the testimony of Scott Richardson concerning the ethical propriety of the $60,000 attorney's fee he charged Andy Tong and other evidence O'Steen considered impermissibly prejudicial.[14]

The motion stated that

> [e]vidence, testimony, and argument relating to violation of the Florida Bar ethics rules . . . would not be relevant to the criminal offenses charged and would

---

[14] Rule 403 states: "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

unfairly place O'Steen's character at issue and thereby prejudicially deny O'Steen's right to a fair trial and due process of law. Admission of any such evidence would violate Rule 403 . . . because whatever probative value it could have, if any, would be substantially outweighed by the danger of unfair prejudice to O'Steen by confusing and misleading the jury to think that O'Steen is being charged with ethical violations. Furthermore, it would paint O'Steen as an unethical person which would cause the jury to believe that O'Steen is inclined to participate in an extortion or bribery scheme.

On April 26, the District Court denied O'Steen's motion to sever Count Four from Counts One through Three. On May 10, the District Court entered an order scheduling the trial of the instant case against O'Steen to begin on June 6, 2022, with jury selection to be held before a magistrate judge on June 3.

On May 13, the District Court heard O'Steen's Rule 403 motion *in limine*. At the hearing, O'Steen's counsel elaborated on the argument in support of his motion:

> There would be the risk that the jury would confuse an ethical violation with a criminal violation, that the jury would commingle the two concepts, that somehow the two are the same, when it – because it is our position that the evidence of the ethical violation doesn't go to any of the elements of the crimes charged. . . . [The jurors] are not lawyers and could easily confuse the two.

In response, the Government argued that Richardson's testimony was relevant because the jury needed to know that Florida criminal defense lawyers may not use contingent fee contracts:

> It is relevant because jurors may assume, you know, from watching – we've all seen plaintiffs' lawyers' commercials on TV: You don't get paid till I get paid. . . . And the testimony that this – that contingent fees that are dependent upon the outcome are not within the bounds of the rules of professional conduct is relevant because it goes to Mr. O'Steen's intent to commit extortion.

The District Court agreed and denied O'Steen's motion *in limine*. O'Steen's violation of the Florida Bar's ethics rules was "relevant to the question of . . . whether the payment and the receipt of the money was wrongful . . . for purposes of the elements of the extortion claim as to [Tong]." The Court qualified its ruling, however, with the statement that it would be "happy to consider [giving] a limiting instruction at the time that evidence is presented."[15]

On May 23, the District Court accepted the guilty pleas Siegmeister had tendered on February 22 and adjudicated him guilty of Counts One, Two, Seven, and Ten of the indictment. On June 6, O'Steen would stand trial alone, on Counts One through Four.

---

[15] During the first day of the trial, the parties and the Court agreed on the wording and timing of a limiting instruction.

*C*

The trial focused on the Siegmeister-O'Steen relationship. Siegmeister was admitted to the Florida Bar in 1994. In 2011, having practiced successfully as a criminal defense attorney in Lake City, the county seat of Columbia County, he decided to challenge the incumbent State Attorney of the Third Judicial Circuit in the November 2011 general election. O'Steen, a criminal defense attorney with a thriving practice in Dixie County, called Siegmeister and "pledged his support." The two men were acquainted as fellow lawyers but had not engaged socially. Siegmeister testified that he wouldn't be surprised if O'Steen handled in excess of 300 criminal cases during his first term as State Attorney, from 2012 to 2016.

Siegmeister was unknown in Dixie County. So, once his campaign got underway, O'Steen introduced him to many prominent people there, including the county commissioners and other officials. Siegmeister testified that he "didn't have anybody like Mr. O'Steen in the other counties." O'Steen was "the only defense attorney that helped [him] that much in any county." Siegmeister was "super pleased" with O'Steen's support.

In November 2015, Siegmeister was reelected as State Attorney for the 2016–2020 term. Soon after the term got underway, the leaders of several civic organizations in Columbia County and surrounding communities approached him with concerns about the number of gambling enterprises that were located in their neighborhoods. Most of the enterprises operated "fish table games."

There were twenty-five gambling houses in Columbia County alone.

On August 28, 2017, Siegmeister, as State Attorney, sent a letter to the "owners, employees, and patrons of internet cafes and sweepstakes adult arcades" engaged in gambling. The letter informed them that the operation of an internet cafe and sweepstakes adult arcade was not exempt from Florida's "gambling laws" and that "all internet and/or sweepstakes adult arcades shall cease operations by Thursday, October 12, 2017, at 5 p.m." In Siegmeister's opinion, the "fish table games . . . were illegal."

All but one of those who received the letter "agreed to shut down." The one was Andy Tong. One of his gambling houses, Treasure Island, was still functioning. So Siegmeister sent his investigator, Ryan Nydam, to case the Treasure Island facility. Nick Cox, the statewide prosecutor, accompanied him. They played the fish table games and developed probable cause to obtain a search warrant, which they promptly secured. Nydam and other investigators in the State Attorney's Office, Lisa Long and J.T. Williams, executed the warrant, found twelve fish table machines and engaged with two people who had wads of cash. The fish tables were "giant" in size and very heavy. They nevertheless seized one table and $10,000 or more of cash. On leaving Treasure Island, they secured the building.

Siegmeister testified that Nydam advised him "over the course of the investigation that some of those fish table games were making $10,000 a week. So an establishment with ten of them

22-13569                Opinion of the Court                15

is making a hundred grand just on those machines." When asked whether it "could be a half a million dollars a month," Siegmeister testified that it was his understanding that "it was an exorbitant amount of money for what the window dressing looked like."

On February 12, 2018, Siegmeister filed an information in the Circuit Court of Columbia County charging Andy Tong and two of his associates with "keeping a gambling house" in violation of Fla. Stat. § 849.01.[16] The crime was a third-degree felony, punishable by imprisonment for up to five years, and Tong needed a lawyer.

Two weeks after Siegmeister filed the information, Tong and his associates retained O'Steen to represent them. After O'Steen appeared in the case, Siegmeister told O'Steen that he was "prosecuting [the case] out of anger." Tong had gotten under his skin. was going to "hammer" him. He told O'Steen that he "better get his money" from Tong up front. Siegmeister testified that he shouldn't have said that. "I reverted to a 26-year-old prosecutor, and I shouldn't have because I had to do extra work; [I] shouldn't have because law enforcement had to spend a lot of hours doing the case. I should have just dealt with it on its face."

O'Steen represented Tong and his associates under a Retainer Agreement. The Agreement provided for a non-refundable retainer of $15,000 and any additional fees needed to enable O'Steen to do the work. The amount of any additional fee would

---

[16] *See Florida v. Tong*, No. CO-2018-000046-CF (Fla. Cir. Ct. 2018).

depend on several factors, such as "the time and labor required and the complexity of the litigation," and would have to be reasonable because Tong only "agree[d] to pay a reasonable fee for such work." The Agreement obligated O'Steen, "as an officer of the court," to comply with "the rules regulating the Florida Bar." In addition to that obligation, because all criminal defense attorneys are inherently bound to provide their clients the effective assistance of counsel mandated by the Sixth Amendment, the contract bound O'Steen to do so.

In April, Siegmeister communicated a plea offer to O'Steen: Tong could plead guilty to a felony and be sentenced to five years' probation, and the case against his two associates would be dismissed. Tong rejected the offer. He told O'Steen that under no circumstances would he plead guilty to a felony.

O'Steen, perhaps sensing that Siegmeister was in way over his head—the trial of the case against Tong would take several weeks and consume more resources than Siegmeister had at his disposal—considered the possibility that Siegmeister might be willing to place Tong in the "PTI" (the pretrial diversion program) and thus allow Tong to avoid a felony conviction. O'Steen discussed the PTI possibility with Tong. He would pursue the possibility if Tong paid him an additional attorney's fee of $50,000.

To avoid paying the additional fee, Tong turned to the FBI. Tong called the nearest FBI office, scheduling an appointment for August 8, 2018. Tong was not a stranger to the FBI. He had met with FBI agents in California before coming to Lake City to set up

his gambling operation in 2015. And on August 24, 2017, after his gambling operation was up and running, he had called the FBI to complain about a police officer's harassment of one of his female employees. The FBI referred the complaint and other complaints it received about the officer to the Department of Justice for investigation.

When Tong arrived at the FBI office on August 8, he met with Special Agents Robert Blythe and Eric Petersen. He informed them about the gambling case Siegmeister was prosecuting and that O'Steen was representing him and his two associates. Then he explained his reason for calling: O'Steen wanted $50,000 to get all of his charges dropped. When he told O'Steen that he could only come up with $30,000, O'Steen's reply was: "I need the money upfront." He would take the $30,000 to Siegmeister's house, and Siegmeister would let him know if it was enough. Agent Blythe testified that Tong's revelation that Siegmeister was demanding a bribe was "not the first allegation [the FBI] had received regarding this particular State Attorney."

The agents "researched" Siegmeister and Tong before deciding whether to seek permission from the head of the FBI in northern Florida to commence an investigation.[17] Agent Blythe testified that Tong had "an extensive criminal record." And that "somebody with an extensive criminal record [is investigated] to corroborate

---

[17] The agents learned that Tong had come to Columbia County from California and applied for a vending license to operate his gambling business in 2016 and had renewed the license in 2017 and 2018.

their testimony one way or the other and collect evidence." He acknowledged that it was possible that someone with a criminal record who was running a criminal operation could have "some other ulterior motive" for bringing the matter to the FBI's attention.

The agents received permission to proceed with an investigation of Siegmeister and his operation of the State Attorney's Office. Tong would serve as their confidential source, code-named "Chance." Their first objective was to corroborate what Tong told them. They would do so in two ways. First, in a conversation that Tong would surreptitiously record, O'Steen would repeat the statements Tong attributed to him in his conversation with Agents Blythe and Petersen. That is, O'Steen needed $50,000 to get all the charges dropped, and he needed the money "up front." He would take the $30,000 Tong had in hand to Siegmeister's house, and Siegmeister would let him know if that was enough.

The agents wired Tong so his conversations with O'Steen could be recorded. They coached Tong on how to question O'Steen and elicit what O'Steen purportedly told him previously about paying Siegmeister. When asked on cross-examination at O'Steen's trial, "Did you say to Tong, 'Ask him to repeat what he told you right before you came and spoke to us?'" Agent Blythe's response was, "That was the objective of these conversations. That was the

22-13569                Opinion of the Court                19

. . . objective to recreate these conversations and to follow it through its course."[18]

Second, the FBI would provide the cash Tong needed to give to O'Steen (presumably to pay off Siegmeister). Agents dusted the bills with "an extremely fine dust that's not visible to the human eye." According to Agent Petersen, "if someone had handled the bills and you shone a UV light on them it would have the dust on them and it would shine."

On Friday, August 17, Tong recorded a conversation he had with O'Steen in which O'Steen expressed the hope that he could get Siegmeister to agree to have Tong placed in the "deferred prosecution" program. To obtain that result, though, it would cost thousands more in attorney's fees:

> O'Steen: So . . . if I gave you a number of sixty thousand dollars and I make yours go away completely, and you're out of here, you can handle that without any agreement? You asked for the number. I don't know if it'll fly or not.

---

[18] In response to this question, "Did you say to Tong, 'Look you told us that O'Steen said he was going to bring the money to Siegmeister?'" Agent Blythe said: "So we coached him to the best of our ability to try to collect as much evidence as possible to recreate the conversations he had had [with O'Steen] before."

20                    Opinion of the Court                 22-13569

[Tong]: Well what does it take . . . I know you're going to go meet up with . . .

O'Steen: I'm going today [to meet with Siegmeister] . . . I'm not going to pay him off. So I don't want you to think that. . . . I mean I'm not going to bribe him. I'm going to go explain to him I got to eat around here. . . . You're saying you could probably come up with more than thirty if I can make yours go away without an agreement, is that would [sic] you're telling me?

. . .

O'Steen: You want a price to make it go away? . . . Let me go over there and talk to him and get a good feel for where, I mean.

[Tong]: Yeah, that's what I want to hear.

Later in the day, O'Steen and Tong spoke several times by telephone. The conversations were recorded. After Tong insinuated that any money he paid O'Steen would be used to bribe Siegmeister, O'Steen rejected the insinuation:

O'Steen: There's no bribe going on. I don't want no insinuation of that. But you're payin' me to use the people that I know to make . . . you won't ever have to go to court to get three felonies dropped. The lowest I'm going to get the results for is sixty-thousand dollars . . . .

. . . .

That's good as I'm gon' do. That's as good as it's gon' get and that's not a payoff. I've got people that will pay for those favors, and I'm not gon' burn em' up and not get paid for it.

. . . .

Bottom line, Andy, if you want me to do it, it's sixty-thousand dollar additional retainer for Michael [O'Steen]. I'm not paying the State Attorney a one red cent.

. . . .

But either way. That's what it's gon' take. And I'm not movin', budgin', I can probably get the other two dismissed, but you're gon' have to do probation otherwise. Or you can go to trial and fight em' out, which I don't think you can win.

. . . .

I am not burnin' up a favor that I [unintelligible] can get somebody to pay for good money to make cases go away. I'm not gon' burn that favor up.

. . . .

Andy, . . . if you don't trust me, I'll try and send you somewhere else, but you're not gone' get the results.

Siegmeister later confirmed that he and O'Steen met on August 17 at a Walmart and discussed placing Tong in the PTI program. Afterwards, they drove to Siegmeister's farm. En route, Siegmeister asked O'Steen how much he was charging Tong. When O'Steen said it was $60,000, Siegmeister told him he could

22                    Opinion of the Court                    22-13569

afford to buy one of his Braford bulls. On Monday, August 20, in a recorded phone conversation with Tong, O'Steen explained the details of the PTI disposition Siegmeister proposed. Among other things, Tong would have to pay approximately $7,500 in restitution.

The FBI provided the $60,000 Tong needed to pay O'Steen. Tong gave O'Steen $30,000 in cash on Thursday, August 23, and another $30,000 in cash on Tuesday, September 4. The bills, having been dusted, were traceable. Meanwhile, on Tuesday, August 27, 2018, at a hearing in open court, Circuit Judge Leandra G. Johnson stated that O'Steen had informed her that he was negotiating a deferred prosecution agreement with the State which had not yet been executed. Assistant State Attorney John Durrett confirmed this and informed Judge Johnson that they were "still discussing the terms."[19] On Wednesday, September 5, 2018, O'Steen's office informed Judge Johnson's judicial assistant that the deferred prosecution agreement had been signed and executed that day. The next day Siegmeister filed a Notice of Pre-Trial Diversion Program with the Circuit Court, which stated that Tong had entered the program.[20]

---

[19] Transcript of hearing in Case No. CO-2018-000046-CF, in the Circuit Court of the Third Judicial Circuit of Florida in and for Columbia County, Florida, at 3. Judge Johnson stated that once the PTI had been executed, the case would be removed from the Court's docket.

[20] On October 1, 2019, Kelly B. Mathis, a Florida attorney, filed an appearance for Tong in the still pending gambling case. Mathis was the first lawyer to represent Tong after Siegmeister filed the information in February 2018. Tong

The following week, the FBI observed O'Steen and his father go to Siegmeister's farm and pick up a Braford bull.[21] To pay for the bull, O'Steen gave Siegmeister a $4,000 check from his father's business account. Later that day, $4,000 in cash was deposited into O'Steen's father's bank account. O'Steen then sold the bull to a farmer at a loss.

From Friday, August 17, through O'Steen's purchase of the bull, the FBI had O'Steen, Siegmeister, and Tong (when he was in the presence of either of them as a confidential FBI source) under surveillance on the ground and from the air. The ground surveillance was carried out by several teams, some not consisting of FBI personnel. Surveillance from the air required eight to twelve days. According to Agent Blythe, the formal FBI investigation "started with a search warrant on August 21st to Verizon to get stored content of text messages." The FBI obtained search warrants again in October and November 2018.

The FBI were unable to corroborate Tong's story: O'Steen wanted an additional attorney's fee of $50,000; Tong had $30,000; O'Steen said he needed to take the $30,000 to Siegmeister's house and Siegmeister would let him know if it was enough. The Government declined to call Tong as witness. It would present its case—especially the Count Three allegation that O'Steen extorted

---

discharged Mathis and hired O'Steen. The docket sheet for the case shows that the gambling case was terminated on May 20, 2020.

[21] The FBI was surveilling O'Steen that day. Agent Blythe testified that they had "people on the ground, people in the air."

$60,000 from Tong through fear of economic harm (**Count 3**)—without his testimony.

★          ★          ★

The Government had listed Tong and Kelly Mathis as prosecution witnesses on the witness list it filed with the District Court on May 31, seven days before O'Steen's trial began.[22] Before that, on May 27, O'Steen had filed his witness list and identified Tong and Mathis as defense witnesses. On June 3, the Government filed its exhibit list,[23] and on June 7, O'Steen filed his exhibit list. contained an Exhibit J labeled "Civil Complaint Tong vs. O'Steen and Siegmeister."[24]

On December 16, 2021, Mathis filed a Verified Civil Complaint against Siegmeister and O'Steen in the U.S. District Court for the Middle District of Florida, Case No. 3:21-cv-1235.[25] The complaint alleged that the defendants, acting under color of state law, "solicited $60,000.00 from Tong in violation of the due process

---

[22] In its May 10, 2022, order setting O'Steen's case for trial, the Court instructed each party to file a witness list and an exhibit list with the Clerk's Office and the Court by June 3.

[23] Then the Government filed amended exhibit lists on June 6 and 15.

[24] O'Steen amended his exhibit list three times—twice on June 7 and once on June 8. Each amendment cited Exhibit J.

[25] We take judicial notice of the commencement of Case No. 3:21-cv-1235 (M.D. Fla.) and the pleadings filed in the case but not for the truth of the matter asserted in those pleadings. *See Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1278, 1278 n.10 (11th Cir. 1999). The case was assigned to the judge presiding over the instant case.

22-13569                Opinion of the Court                25

clause of the 14th Amendment" and sought damages under 42 U.S.C. § 1983. The complaint also alleged that O'Steen was liable for legal malpractice in among other things "the acceptance of $60,000 bribe money from Tong." Notably, the complaint contained no reference to the FBI or its investigation of the State Attorney.

On April 11, 2022, Tong amended his complaint against Siegmeister and O'Steen. The amendment's factual recitations mirrored conduct alleged in Counts One through Three of the indictment in the instant case. Count I, brought under 42 U.S.C. § 1983, alleged that Siegmeister deprived Tong of due process of law and subjected him to an excessive fine in violation of the Eighth and Fourteenth Amendments. Count II, also brought under § 1983, alleged that the defendants conspired to extort Tong, deprive him of his property without due process of law, and subject him to an excessive fine in violation of the Eighth and Fourteenth Amendments. Count III, brought against O'Steen for legal malpractice, alleged that he accepted $60,000 in "bribe money" from Tong, and sought damages, including the payments to O'Steen. Like the original complaint, the amended complaint contained no reference to the FBI or its investigation of the State Attorney.

On April 15, 2022, the United States, represented by the prosecutors in the instant criminal case, filed an unopposed motion pursuant to Rule 24(a)(2) of the Federal Rules of Civil Procedure[26] to

---

[26] Rule 24 states in relevant part:

26                    Opinion of the Court                    22-13569

intervene in the civil action Tong had brought against Siegmeister and O'Steen. The motion sought leave to intervene in the civil action and a stay of its proceedings "until the conclusion of a pending federal prosecution involving Marion Michael O'Steen and Jeffrey Alan Siegmeister, defendants herein, and the same facts, evidence, witnesses, and circumstances at issue in the instant civil suit." The prosecutors requested a

> limited stay of the civil proceedings, with any appropriate adjustments to the Court's Case Scheduling Order [in the civil case], to avoid prejudice or harm to the government's ongoing federal criminal case and the parties in this case as the conduct at issue in this civil action overlaps with a significant aspect of the ongoing federal criminal prosecution.

In sum, the Government requested that the Court "stay this civil proceeding for a period of ninety days, adjust the Case Scheduling Order as appropriate, or provide other relief to the government as required in the interests of justice."

---

> (a) Intervention of Right. On timely motion, the court must permit anyone to intervene who:
>
> . . .
>
>> (2) claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest.

22-13569                Opinion of the Court                27

⋆          ⋆          ⋆

In the criminal case, the Government would rely on Scott Richardson's expert opinion testimony to prove that Tong *consented* to pay O'Steen an additional attorney's fee of $60,000 by "extortion" "through fear of economic harm"[27] (**Count 3**).

So the Government called Richardson to the witness stand. Richardson testified that he was a board-certified lawyer who (1) previously had served as the "second-in-command" prosecutor in the Palm Beach County State Attorney's Office; (2) was currently in private practice as a criminal trial lawyer; and (3) had represented lawyers and judges who had been accused of violating the Florida Bar's ethics rules. In his view, O'Steen had violated the Florida Bar's ethics rules:

> A. My opinion is that two rules of professional conduct were violated.
>
> Q [by the prosecutor]. And tell us about those one at a time, please.

---

[27] The District Court's Instruction No. 19, which mirrored Government's proposed Instruction No. 15, instructed the jury:

> 'Extortion' means obtaining property from a person who consents to give it up because of the wrongful use of actual or threatened force, violence, or fear. 'Fear' means a state of anxious concern, alarm, or anticipation of harm. It includes the fear of financial loss as well as fear of physical violence.

A. All right. They are Rule 4-1.5(a) with regard to greatly excessive fees and 4-1.5(f)(3)(B) regarding contingent fees in criminal cases.

. . . .

Q. And in your expert opinion, is a $60,000 fee under these circumstances appropriate for the pretrial intervention or deferred prosecution option?

A. I felt it was clearly excessive.

At this point during Richardson's testimony, defense counsel renewed O'Steen's Rule 403 objection. The Court overruled the objection, stating that it was doing so for the reason it gave in denying O'Steen's motion *in limine*. Later, in submitting Count Three to the jury, the District Court gave this instruction:

During the trial you heard some evidence suggesting that the Defendant may have violated certain rules of the Florida Bar regulating the ethical practice of law. Although you may consider this evidence in deciding whether the Defendant is guilty of the crimes charged in the indictment, remember that the violation of Florida Bar regulations or Florida Bar ethical rules does not constitute a criminal offense. You may not convict the Defendant on any of the charges in the indictment solely because you find that he has violated any Florida Bar rules or regulations regarding ethics.

When the Government rested its case-in-chief, O'Steen moved the District Court for a judgment of acquittal[28] on the ground that the Government failed to make out a case under Count Three because the $60,000 he obtained from Andy Tong was not extortionate; the money was not Tong's property but the Government's.[29] The Court reserved its ruling on the motion. After the evidence closed, O'Steen renewed the motion and again the Court reserved its ruling. The Court denied the motion a day after the jury returned their verdict.

## D

After it reserved its ruling on O'Steen's renewed motion for judgment of acquittal, the District Court convened a charge conference to settle the jury instructions on Counts One through Four of the indictment. The Court began the conference by providing the parties with a set of instructions it composed after reviewing the proposed instructions the parties had submitted before trial.

Count Three charged O'Steen with obtaining Tong's property, $60,000, by extortion and extortion under color of official right and with aiding and abetting Siegmeister obtain the property in the same extortionate way. We set out first the Government's

---

[28] *See* Fed. R. Crim. P. 29.

[29] O'Steen's motion cited other grounds for Rule 29 relief that defense counsel conceded were foreclosed by precedent and were asserted to preserve the record for appeal, e.g., that the Government failed to prove the interstate nexus, or that the extortion (**Count 3**) had an effect on interstate commerce.

proposed instruction on the extortion offenses and the instructions the District Court gave the jury.

*i*

The Government's proposed Instruction No. 15 stated what the Government had to prove to establish that O'Steen was guilty of "extortion" or "extortion under color of official right." *See* Appendix A (**Counts 3** and **4**). The instruction treated Count Three as having charged O'Steen alone. Thus, No. 15 would inform the jury:

> The Defendant can be found guilty [on Count Three] only if all the following facts are proved beyond a reasonable doubt:
>
> (1)   the Defendant caused [Andy Tong] to part with property;
>
> (2)   the Defendant did so knowingly by using "extortion" or "extortion under color of official right;" and
>
> (3)   the extortionate transaction delayed, interrupted, or affected interstate commerce.

The District Court's Instruction No. 19, *see* Appendix B, replicated Government's No. 15 with a slight modification to No. 15's introduction.[30] As modified, No. 19 informed the jury that "Count Three charges the Defendant with committing or aiding and

---

[30] The District Court's Instruction No. 19 was a combination of Eleventh Circuit Pattern Jury Instructions O70.1 and O70.2.

22-13569              Opinion of the Court                    31

abetting the commission of the substantive offense of interfering with commerce by extortion" (**Counts 3** and **4, 7** and **8**).[31] Whereas Government's No. 15 informed the jury: "As charged in Count Three, it's a Federal crime to extort something from someone else and in doing so to obstruct, delay, or affect interstate commerce" (**Counts 3** and **4**).

*ii*

Count Three charged O'Steen with aiding and abetting Siegmeister in Siegmeister's acquisition of Tong's $60,000 by extortion and extortion under color of official right (**Counts 7** and **8**). The Government proposed in Instruction No. 17 that the District Court use Eleventh Circuit Pattern Jury Instruction S7 in instructing the jury on the aiding and abetting allegations. *See* Appendix C.

Instruction S7 states in its opening sentence that "it is possible to prove the Defendant guilty of a crime even without evidence that the Defendant personally performed every act charged." Because S7 is a pattern jury instruction and an abstract statement of

---

[31] The jurors were given a redacted copy of the indictment when they retired to deliberate. Instruction No.14 referred to the indictment thus:

> The indictment in this case charges the Defendant with committing four separate crimes, called "counts." Each count has a number. You will be given a copy of the indictment is not evidence of anything. It is simply the formal document that sets forth the charges. indictment to refer to during your deliberations. I remind you that the indictment is not evidence of anything. It is simply the formal document that sets forth the charges.

law—how a person can be held criminally liable as an accomplice for aiding and abetting the commission of a generic crime—S7 did not specify the crime O'Steen allegedly aided and abetted or who committed the crime. That information would have to be added to S7 by interlineation so that the jury would know that to find O'Steen guilty of aiding and abetting as charged in Count Three, the jury would have to first find beyond a reasonable doubt that Siegmeister acquired Tong's $60,000 by extortion or extortion under color of official right as Count Three alleged (**Counts 1** and **2**).

The District Court, in Instruction No. 21, adopted Pattern Jury Instruction S7, as the Government proposed, in instructing the jury on aiding and abetting. *See* Appendix C. Instruction No. 21 differed from S7 in that the District Court inserted the following language preceding the opening sentence of S7: "You will note that, in Count Three, the Defendant is charged with aiding and abetting the commission of the alleged crime."[32] In reading Count Three and S7 together, the jury could conclude that "the alleged crime"

---

[32] In drafting O'Steen's proposed instruction on Count Three, O'Steen's lawyers apparently read Count Three as charging Siegmeister with obtaining Tong's $60,000 under color of *official right* (**Count 2**) and O'Steen with aiding and abetting Siegmeister's commission of the crime (**Count 8**). *See* Appendix D. Counsel therefore proposed that the Court instruct the jury that to find O'Steen guilty of the aiding and abetting offense, they had to find first that Siegmeister obtained Tong's money under color of official right. The lawyers effectively abandoned their proposed instruction at the charge conference when they did not request the Court to adopt it.

was Siegmeister's acquisition of Tong's $60,000 by extortion or extortion under color of official right and that O'Steen aided and abetted Siegmeister's commission of the crime (**Counts 7** and **8**).

*iii*

Neither party objected to the District Court's proposed instructions as modified, so those instructions became part of the Court's charge to the jury. The verdict form the District Court submitted to the jury without objection was the verdict form the Government drafted and submitted to the District Court along with its proposed jury instructions. Paragraph five of the verdict form asked the jury to find whether O'Steen was not guilty or guilty of Count Three, which charged him with "Interference with Commerce by Extortion."

The jury found O'Steen guilty. Given that finding, the verdict form instructed the jury to "complete the answer to Question 6." The verdict form provided the answer. The jury was to find O'Steen guilty of committing or aiding and abetting the commission of extortion or extortion under color of official right or both:

> We, the jury, unanimously find MARION MICHAEL O'STEEN committed or aided and abetted the commission of the following (choose one):
>
> _____ Extortion
>
> _____ Extortion Under Color of Official Right
>
> _____ Both Extortion and Extortion Under Color of Official Right.

The jury checked "Both." Then, turning to Count Four, they found O'Steen guilty as charged.

*E*

O'Steen asks us to reverse his Count Three conviction on the basis that a private citizen cannot be convicted as a principal to extortion under color of official right. He concedes that he did not raise the issue in District Court, so we review for plain error. *See United States v. Margarita Garcia*, 906 F.3d 1255, 1266 (11th Cir. 2018).

However, O'Steen did argue in District Court that, under the Hobbs Act, the extorted property "must be actual property of the victim," rather than "sting money the government provided." Therefore, the $60,000 that O'Steen was alleged to have extorted would not qualify under the statute, because that money was originally provided by law enforcement. The District Court ultimately rejected that argument, holding that the Hobbs Act merely requires "obtaining property from another," regardless of the property's source or ownership.

Now on appeal, O'Steen reiterates that "[t]he $60,000 was not Mr. Tong's money—it was the FBI's money." And because the money was not Tong's, the Government could not prove that Tong experienced any "fear of economic harm" under the Hobbs Act. O'Steen's brief cites no cases in support of this proposition, but it is enough for our purposes of review that he raised the issue. *See United States v. Starke*, 62 F.3d 1374, 1379 (11th Cir. 1995) (noting that "we liberally read briefs to ascertain the issues raised on appeal").

Therefore, we review the sufficiency of the evidence to determine whether, viewing the facts in the light most favorable to the Government, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Ransfer*, 749 F.3d 914, 930 (11th Cir. 2014) (quoting *Jackson v. Virginia*, 334 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979)).

## F

The jury found O'Steen guilty of Count Three after finding that he committed extortion and extortion under color of official right (**Counts 3** and **4**) *or* that he aided and abetted the commission of those offenses by another person, i.e., Siegmeister (**Counts 7** and **8**). We review the support in the record for those convictions and conclude that we must reverse. We begin with the latter two offenses.

### i

Count Three alleged that O'Steen extorted Andy Tong and that he aided and abetted Siegmeister in his acquisition of Tong's $60,000 by extortion and extortion under color of official right (**Counts 7** and **8**). To obtain O'Steen's convictions for aiding and abetting the commission of those offenses, the Government had to prove, as a threshold element, that Siegmeister committed the offenses (**Counts 1** and **2**).

The District Court's Instruction No. 21, which adopted the Government's proposed Instruction No. 17, instructed the jury on the aiding and abetting offenses pursuant to Eleventh Circuit Pattern Jury Instruction S7. *See* Appendix C. The instruction did not

tell the jury what the Government had to prove to enable them to find O'Steen guilty of the offenses (**Counts 7** and **8**). The closest Instruction S7 came to explaining what the Government had to prove was in two sentences: "A Defendant 'aids and abets' a person if the Defendant intentionally joins with the person to commit a crime," and "[a] Defendant is criminally responsible for the acts of another person if the Defendant aids and abets the other person."[33]

Siegmeister was "the person" and "the other person." The jury was aware that Siegmeister was the alleged principal because they had a copy of Count Three and the allegation that Siegmeister and O'Steen, aiding and abetting each other, obtained Tong's property through extortion and extortion under color of official right.

---

[33] In drafting its proposed Instruction No. 17, we assume that the Government's attorneys knew that to find O'Steen guilty of the aiding and abetting offenses (**Counts 7** and **8**), the jury had to find beyond a reasonable doubt, as a threshold element of the aiding and abetting offenses, that Siegmeister obtained Tong's $60,000 by extortion and extortion under color of official right (**Counts 1** and **2**). The Government's attorneys, and O'Steen's lawyers as well, knew about this threshold element because proof of the element is hornbook law. An accused cannot be convicted as an accomplice of aiding and abetting the commission of a crime by a principal unless the prosecution first proves beyond a reasonable doubt that the principal committed the crime. Wayne R. LaFave, *Substantive Criminal Law* § 13.3(c) (3d ed 2023). This is so even if "the principal . . . has been acquitted or has not yet been tried." *Id.* And "even when the principal had . . . been convicted, the guilt of the principal must be established at the trial of the accomplice as part of the proof on the charge against the accomplice." *Id.*; *See Sandefer v. United States*, 447 U.S. 10, 14–20, 100 S. Ct. 1999, 2003–06 (1980) (holding that a defendant accused of aiding and abetting in the commission of a federal offense may be convicted even if the alleged principal has been acquitted of that offense).

But Instruction S7 did not inform them of what the Government had to prove to obtain O'Steen's convictions for aiding and abetting, the "other person's" crime.

Suppose the jurors, adding two and two together, read Count Three and the reference to Count Three in the District Court's Instruction No. 21 to mean that Siegmeister was "the person" and "the other person." Would that save O'Steen's aiding and abetting convictions? (**Counts 7** and **8**). No, because the Government did not prove that Siegmeister acquired Tong's $60,000 by extortion and extortion under color of official right.[34] O'Steen kept the $60,000 and was indicted and convicted for failing to report it.[35]

In sum, there is not a shred of evidence to support O'Steen's conviction for aiding and abetting Siegmeister's acquisition of $60,000 through extortion and extortion under color of official right. Whether the Count Three conviction can be salvaged therefore depends on whether O'Steen himself obtained the $60,000 attorney's fee from Tong through extortion or extortion under color

---

[34] Rather, the evidence established that Siegmeister aided and abetted O'Steen's acquisition of the additional $60,000 attorney's fee O'Steen charged Tong by delaying the paperwork on Tong's pretrial diversion disposition until O'Steen had the money on hand.

[35] There is no doubt that O'Steen kept the $60,000. On September 9, 2022, after the jury returned their verdicts, the Government's attorneys filed United States' Motion for Preliminary Order of Forfeiture asking the District Court to order O'Steen to forfeit $60,000 to the United States, i.e., the money provided to Tong and given by him to O'Steen. The Court granted the motion on September 28, 2022. And in sentencing O'Steen on October 18, 2022, the order was made part of O'Steen's sentence.

of official right (**Counts 3** and **4**). We consider whether O'Steen committed the two offenses as alleged in reverse order.

*ii*

O'Steen argues that the District Court committed plain error in granting the Government's request that the jury be instructed to determine whether he obtained Tong's money by extortion under color of official right. He maintains that as a private person, he could not be charged with the offense. Only public officials can be charged.[36] He cites a litany of decisions making that point. *See Evans v. United States*, 504 U.S. 255, 268 (1992); *United States v. Manzo*, 636 F.3d 56, 64 (3d Cir. 2011); *United States v. McFall*, 558 F.3d 951, 955, 959–60 (9th Cir. 2009); *United States v. Saadey*, 393 F.3d 669, 675 (6th Cir. 2005); *United States v. McClain*, 934 F.2d 822, 831 (7th Cir. 1991).

The Government counters O'Steen's argument by saying that the District Court's jury instructions as a whole precluded the jury from finding that O'Steen had committed extortion under color of official right as a principal. The Court instructed the jury, "Extortion under color of official right is the wrongful taking or receipt of money or property by a public officer who knows that the money or property was taken or received in return for doing an

---

[36] The District Court's Instruction No. 19, which adopted Government's Instruction No. 15, was a combination of Eleventh Circuit Pattern Jury Instructions 070.1 and 070.2 and uses the words "public official" six times.

official act." "There was only one public officer here: State Attorney Siegmeister."

The Government is right. But it ignores the instruction it requested the District Court to give. The District Court's Instruction No. 19 adopted the Government's Instruction No. 15. And that instruction told the jury to convict O'Steen on Count Three if the Government proved beyond a reasonable doubt that he obtained Tong's property "by using 'extortion' or 'extortion under color of right.'" *See* Appendix A. The word "public officer" appears five times in Instruction Nos. 15 and 19. The Government presumably requested that the Court give Instruction No. 15 because Count Three alleged that O'Steen extorted Tong's property "under color of official right."

What's more, the Government was well aware of the differences between extortion and extortion under color of official right. The offenses have distinct elements. A public official extorting a person's property under color of official right does so in return for doing or not doing an official act. In its proposed Instruction No. 15, the Government made that absolutely clear:

> "Extortion under color of official right" is the wrongful taking or receipt of money or property by a public officer who knows that the money or property was taken or received in return for doing an official act. It does not matter whether or not the public officer employed force, threats, or fear.

Appendix A.

The differences between extortion and extortion under color of official right are so striking that it would be a strange case if a public officer committed both offenses simultaneously. In Count Three, the Government presented a strange case. It alleged that Siegmeister, a public official, committed both offenses (**Counts 1** and **2**) and that O'Steen committed both offenses as well (**Counts 3** and **4**).

In sum, the District Court's Instruction No. 19 invited the jury to find O'Steen guilty on Count Three if the Government proved beyond a reasonable doubt that he obtained Tong's property through extortion under color of official right. O'Steen's Count Three conviction cannot be salvaged on the basis of the jury's findings that O'Steen committed extortion under color of official right (**Count 4**) or that he aided and abetted the commission of extortion and extortion under color of official right (**Counts 7** and **8**). If the conviction is to be salvaged, it has to be on the theory that O'Steen obtained Tong's property, "with his consent, induced by wrongful use of actual or threatened force, violence, or fear . . . of financial loss" (**Count 3**). 19 U.S.C. § 1951(a); Appendix B. To be precise, there must be some evidence that O'Steen committed extortion through fear of financial loss.

*iii*

In his Rule 29 motion for acquittal at trial, O'Steen argued that he could not be convicted of Hobbs Act extortion because the

extorted property must be the "actual property" of the victim.[37] We review this issue on appeal because it was raised in O'Steen's initial brief, arguing that "[t]he $60,000 was not Mr. Tong's money—it was the FBI's money." Although O'Steen frames this argument as rebutting Tong's alleged "fear of economic harm," it actually goes toward the Hobbs Act's *commerce* element, which is the basis for the federal government's jurisdiction over the offense.

The Hobbs Act defines "commerce" to include all "commerce over which the United States has jurisdiction." 18 U.S.C. § 1951(b)(3). In other words, the statute reaches only as far as Congress can exercise its constitutional authority over interstate commerce. *See* U.S. Const. art. I, § 8, cl. 3. In order to establish the required "interstate nexus," the Government must "show a realistic probability of an effect, or some actual de minimis effect, on commerce." *United States v. Kaplan*, 171 F.3d 1351, 1354 (11th Cir. 1999). More specifically, the Government can prosecute a substantive

---

[37] O'Steen argued:

> As to Counts Two and Three, the Hobbs Act requires extortion—the extortion must be of property—and that's somewhat of a term of art for the Hobbs Act—that the property be obtained from the victim. The property was the $60,000 sting money the government provided. . . .

> I did a diligent search, Judge. I could not find any case law on this. My argument is that the property for extortion for [the] Hobbs Act must be actual property of the victim. And I could find no law to the contrary.

crime of Hobbs Act extortion only when one of three conditions is met:

> (1) the crime depletes the assets of an individual who is directly engaged in interstate commerce; (2) the crime causes the individual to deplete the assets of an individual who is directly engaged in interstate commerce; *or* (3) the number of individuals victimized or the sums involved are so large that there will be a cumulative impact on interstate commerce.

*United States v. Diaz*, 248 F.3d 1065, 1084–45 (11th Cir. 2001).

Although this Court has never squarely considered whether the Government can prove Hobbs Act extortion where the extorted property was provided solely by law enforcement, the Sixth Circuit addressed precisely that question in *United States v. DiCarlantonio*, 870 F.2d 1058 (6th Cir. 1989). In that case, like here, the allegedly extorted money had been provided to the victim by the FBI. *See DiCarlantonio*, 870 F.2d at 1060. And the Sixth Circuit held that "the mere receipt of government funds" could not create the requisite effect on interstate commerce. *Id.* at 1060–61; *see also United States v. Rindone*, 631 F.2d 491, 494 (7th Cir. 1980).

We agree. Although the use of government funds as bribe money depletes the funds available to the *government*, it does not "deplete[] the assets of an *individual who is directly engaged in interstate commerce.*" *See Diaz*, 248 F.3d at 1084–45 (emphasis added). Therefore, evidence of an alleged extortion involving purely

government money cannot establish even the minimal effect on interstate commerce that is required by the Hobbs Act.

★          ★          ★

We have combed the record for evidence that O'Steen committed extortion through fear of financial harm as alleged in Count Three. *See Fries*, 725 F.3d at 1293. We find none. Since O'Steen, as the principal, committed none of the Hobbs Act offenses Count Three alleged (**Counts 3** and **4**) and, as an accomplice, did not aid and abet their commission (**Counts 7** and **8**)**,** we cannot affirm his Count Three conviction. The District Court's judgment on Count Three is therefore reversed.

## II.  The Count Four Appeal

*A*

*i*

Count Four of the indictment alleged that on or about August 23, 2018, O'Steen, in the course of his law practice, "received more than $10,000 in currency in one transaction [and] did willfully fail to file a report, to-wit: Form 8300, with the Financial Crimes Enforcement Network, within fifteen days after the currency is received, as prescribed by the applicable regulations," in violation of 31 U.S.C. §§ 5311 and 5322 and 31 C.F.R. § 1010.330(a).

Section 5331 provides that "[a]ny person . . . who . . . receives more than $10,000 in coins or currency . . . shall file a report . . . with respect to such transaction . . . *at such time . . . as the Secretary may, by regulation, prescribe.*" 31 U.S.C. § 5331(a) (emphasis added).

The relevant Secretary of the Treasury regulation provides that a recipient must report an "initial payment in excess of $10,000 . . . within 15 days of its receipt." 31 C.F.R. § 1010.330(b)(1); *see* also *id.* § 1010.330(b)(3) ("The report must be made within 15 days after receiving the payment in excess of $10,000 . . . ."). Section 5322 provides criminal penalties for "[a] person [who] willfully violat[es] this subchapter [including 31 U.S.C. § 5331] or a regulation prescribed under this subchapter [including 31 C.F.R. § 1010.330]." 31 U.S.C. § 5322(a).

On May 20, 2019, after learning of the FBI's investigation into Siegmeister's operation regarding the State Attorney's Office and the Tong gambling case, O'Steen filed a Form 8300 with the "Department of the Treasury Internal Revenue Service" reporting that on August 24 and again on September 4, 2018, his law office, M. Michael O'Steen, P.A., had received from Andy Tong, an "Internet Café Owner," $30,000 in cash for "Legal Services" performed.[38] O'Steen violated the law, as charged in Count Four, when he failed to file a Form 8300 by September 7, 2018, fifteen days after receiving the first of Tong's two $30,000 payments as required by 31 C.F.R. § 1010.330(a) and (b).

---

[38] Because the Form 8300 O'Steen filed omitted "information . . . in the indicated required fields," the agency was "not able to process the form." So, on November 18, 2019, it "return[ed] the reports and request[ed] the missing information," highlighting "those fields missing critical information on the enclosed report." O'Steen subsequently provided the information.

O'Steen appeals his Count Four conviction on the ground that the District Court erred in denying his motion for judgment of acquittal on Count Four.[39] He contends that he was entitled to an acquittal because the Government failed to prove beyond a reasonable doubt that he *knew* of the fifteen-day filing period by September 7, 2018.

We decide de novo whether the Government's evidence was sufficient to prove O'Steen's knowledge of the fifteen-day filing period. *See United States v. Garcia*, 405 F.3d 1260, 1269 (11th Cir. 2005). In doing so, we consider the evidence in a light most favorable to the Government, making all reasonable inferences and credibility choices in its favor. *Id.* So long as the jury, "choosing among reasonable interpretations of the evidence, could find beyond a reasonable doubt" that O'Steen was aware of the fifteen-day filing

---

[39] O'Steen moved for judgment of acquittal on Count Four at the close of the Government's case-in-chief. The District Court reserved its ruling on the motion. O'Steen renewed his motion at the close of the evidence, and the Court once again reserved its ruling. At a hearing it convened two days after the jury returned their verdicts, the District Court denied the motion with this statement:

> Mr. O'Steen filed the Form 8300 six days after learning that he was being investigated by the FBI in relation to Mr. Tong and that the FBI was aware that he had received a $60,000 payment. The jury could certainly draw the inference by his action immediately after learning of the investigation that he had knowledge of the reporting requirement and the fact that he had failed to act in conformance with that requirement, and it appears that the jury drew that inference.

period, the Government made out a case for the jury on Count Four. *United States v. Pineiro*, 389 F.3d 1359, 1367 (11th Cir. 2004).

ii

Decisions of the former Fifth Circuit in *United States v. Granda*, 565 F.2d 922 (5th Cir. 1978),[40] and the Supreme Court in *Ratzlaf v. United States*, 510 U.S. 135, 114 S. Ct. 655 (1994), confirm that O'Steen's knowledge of the fifteen-day filing period is an element of the Count Four crime.

In *Granda*, the Court addressed two reporting statutes, then codified at 31 U.S.C. §§ 1058 and 1101, materially the same as, and the predecessors of §§ 5322 and 5331. It held that "the terms knowing and willful require proof of the defendant's knowledge of the reporting requirement and his specific intent to commit the crime." *Granda*, 565 F.2d at 925–26. In *Ratzlaf*, the Supreme Court, approving the holdings of *Granda* and other Court of Appeals decisions on point, found it "significant that § 5322(a)'s omnibus 'willfulness' requirement, when applied to other provisions in the same subchapter, consistently has been read by the Courts of Appeals to require both 'knowledge of the reporting requirement' and a 'specific intent to commit the crime,' i.e., 'a purpose to disobey the law.'" *Ratzlaf*, 510 U.S. at 141, 114 S. Ct. at 659 (quoting *United States v. Bank of New England, N.A.*, 821 F.2d 844, 854–59 (1st Cir. 1987)).

---

[40] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

These decisions, the Court observed, "describe a 'willful' actor as one who violates 'a known legal duty.'" *Id.* (quoting *United States v. Sturman*, 951 F.2d 1466, 1476–77 (6th Cir. 1991)).

Ratzlaf's defense was that he was ignorant of his legal duty. In upholding his defense, the Court said:

> We do not dishonor the venerable principle that ignorance of the law generally is no defense to a criminal charge. In particular contexts, however, Congress may decree otherwise. That, we hold, is what Congress has done with respect to 31 U.S.C. § 5322(a) and the provisions it controls. To convict Ratzlaf of the crime with which he was charged, violation of 31 U.S.C. §§ 5322(a) and 5324(3), the jury had to find he knew the structuring in which he engaged was unlawful.

*Id.* at 149 (citations omitted).

### iii

The Government could not prove that O'Steen knew of the fifteen-day reporting period by direct evidence, so it relied on circumstantial evidence to prove the fact, citing *Ratzlaf* for the proposition that a "jury may, of course, find the requisite knowledge on defendant's part by drawing reasonable inferences from the evidence of defendant's conduct." *See id.* at 149 n.19. The Government points to circumstantial evidence here—and the circumstantial facts the evidence shows—as proof that O'Steen knew of the reporting requirement. The evidence was presented by two

48                    Opinion of the Court                    22-13569

witnesses, FBI Agent Craig Castiglia and Jolie Garner, a teller at
O'Steen's bank.

Agent Castiglia testified that on May 14, 2019, six days after
the FBI's public corruption investigation into the State Attorney's
Office and Siegmeister's dealings with O'Steen became overt with
the execution of search warrants and seizure of cellphones,
O'Steen filed a Form 8300 regarding the two $30,000 cash payments
he received from Tong on August 24 and September 4, 2018.
Castiglia identified the Form 8300.

Agent Castiglia also identified Government Exhibits 113 and
113AA. Together, the two exhibits established that in April 2013,
O'Steen attended a continuing legal education ("CLE") course that
included a lecture by Michael Ross, an attorney, entitled "Cutting
Edge Ethics." Ross's presentation contained this statement:

> If a lawyer gets paid cash do you have to reveal that?
> Yes. There are federal laws that say lawyers have to
> reveal cash over ten thousand dollars even though it
> is very bad for the client to tell the federal government
> that you got ten thousand dollars in cash from them.
> But you are required by law to do it.

The CLE course lasted two and a half hours. The clip of the above
statement lasted 30 seconds.

Agent Castiglia testified that O'Steen had an attorney trust
("IOLTA") account at his bank. On September 29, 2017, O'Steen
deposited into the account a check written by Joseph Riggs and Jen-
nie Falkenberry in the sum of $20,700. On October 19, 2017,

O'Steen wrote two checks on his IOLTA account to David Falkenberry each in the sum of $9,999.99.

Jolie Garner testified that on October 19, 2018, O'Steen came to her teller's window, deposited $9,900 in cash and then asked, "How much until the IRS finds out?" When she attempted to hand him the Currency Transaction Reporting pamphlet, he refused it and told her he "already knew what it said." pamphlet stated that federal law requires institutions to report cash transactions exceeding $10,000. But the pamphlet did not state what federal law mandated as to the timing of the report.

The District Court found that the jury could have reasonably inferred from O'Steen's filing of the Form 8300 immediately after learning that he was under FBI investigation that he knew that he had failed to act in conformity with the reporting requirements. The Government agrees:

> The evidence shows that O'Steen was an attorney with general knowledge about transaction-reporting requirements, including the requirement to report cash transactions of over $10,000. The evidence also shows that O'Steen requested that Tong pay him in cash. A jury could infer that an attorney who knows he is required to report cash transactions and who is paid by his client in cash would know there is a time limit for reporting the transaction, or at the very least know that he could not wait eight months to report it.

The circumstantial facts revealed in the testimony of these witnesses and the documentary evidence they identified are the sum and substance of the Government's proof that O'Steen was aware on September 7, 2018, of the fifteen-day period he had from his receipt of $30,000 from Tong on August 23, 2018, in which to file a Form 8300 disclosing his receipt of the money. The question is whether the Government's proof was enough to permit a jury to find beyond a reasonable doubt that he was aware of the fifteen-day filing period.

At oral argument, the Government's attorney had an answer to the question. She said she "[didn't] think it [was] necessary . . . that the Government proved that [O'Steen] knew that there was a fifteen-day requirement." Then, assuming that the Government had to prove that he knew, she offered as circumstantial proof of O'Steen's knowledge that he had a "general sense" about the deadline because he is a lawyer.

The attorney was, in effect, asking that we take judicial notice that O'Steen was aware of the filing requirement by September 7, 2018. Under Federal Rule of Evidence 201, Judicial Notice of Adjudicative Facts, O'Steen's awareness of the fifteen-day requirement qualifies as an adjudicative fact. But we can't notice it because it does not qualify as something that "is not subject to reasonable dispute" on the theory that it is "generally known" or could "be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).

22-13569                Opinion of the Court                51

We therefore conclude that the circumstantial evidence was insufficient to prove beyond a reasonable doubt that O'Steen knew of the reporting requirement by September 7, 2018, but failed to comply with it by that date as alleged in Count Four. The District Court erred in denying his motion for a judgment of acquittal on Count Four, and so his conviction on that count is reversed. [41]

### III.  The Disposition of the Appeal

For the reasons stated in reviewing the Count Three Appeal and the Count Four Appeal, the judgment of the District Court is reversed. On receipt of our mandate, the Court is instructed to enter a judgment of acquittal for Mr. O'Steen.

**REVERSED**.

---

[41] Judge Jordan's well-reasoned concurrence provides helpful additional commentary on the inadequacy of the Government's evidence. *See* Jordan Op. at 13–17.

APPENDIX A

GOVERNMENT'S REQUESTED JURY INSTRUCTION NO. 15

O70.1, O70.2

Interference with Commerce by Extortion (Actual or Threatened Fear and Color of Official Right) 18 U.S.C. § 1951(a)

As charged in Count Three, it's a Federal crime to extort something from someone else and in doing so to obstruct, delay, or affect interstate commerce.

The Defendant can be found guilty of this crime only if all the following facts are proved beyond a reasonable doubt:

(1)　the Defendant caused a client identified in the Indictment to part with property;

(2)　the Defendant did so knowingly by using "extortion" or "extortion under color of official right;" and

(3)　the extortionate transaction delayed, interrupted, or affected interstate commerce.

"Property" includes money, other tangible things of value, and intangible rights that are a source or element of income or wealth.

Extortion" means obtaining property from a person who consents to give it up because of the wrongful use of actual or threatened force, violence, or fear. "Fear" means a state of anxious concern, alarm, or anticipation of harm. It includes the fear of financial loss as well as fear of physical violence.

"Extortion under color of official right" is the wrongful taking or receipt of money or property by a public officer who knows that the money or property was taken or received in return for [doing] [not doing] an official act. It does not matter whether or not the public officer employed force, threats, or fear. To qualify as an official act, the public official must have made a decision or taken an action, or agreed to make a decision or take an action on a question, matter, cause, suit, proceeding, or controversy.

Further, the question, matter, cause, suit, proceeding, or controversy must involve the formal exercise of governmental power. It must be similar in nature to a lawsuit before a court, a determination before an agency, or a hearing before a committee. It must also be something specific which requires particular attention by a public official.

The public official's decision or action or agreement to make a decision or take an action on that question, matter, cause, suit, proceeding, or controversy may include using his official position to exert pressure on another official to perform an official act, or to advise another official, knowing or intending that such advice will form the basis for an official act by another official. But setting up a meeting, talking to another official, or organizing an event (or agreeing to do so) – without more – is not an official act.

It is not necessary that the public official actually make a decision or take an action. It is enough that he agrees to do so. The agreement need not be explicit, and the public official need not specify the means he will use to perform his end of the bargain.

Nor must the public official in fact intend to perform the official act, so long as he agrees to do so.

"Wrongful" means to get property unfairly and unjustly because the person has no lawful claim to it.

"Interstate commerce" is the flow of business activities between one state and anywhere outside of that state.

The Government doesn't have to prove that the Defendant specifically intended to affect interstate commerce in any way. But it must prove that the natural consequences of the acts described in the Indictment would be to somehow delay, interrupt, or affect interstate commerce. If you decide that there would be any effect at all on interstate commerce, then that is enough to satisfy this element. The effect can be minimal. This element can be met when the object includes the movement of money between states and when the origin of the extortionate funds is fictional.

APPENDIX B

COURT'S PROPOSED JURY INSTRUCTION NO. 19

Interference with Commerce by Extortion Hobbs Act: Racketeering (Force or Threat of Force; Color of Official Right) 18 U.S.C. § 1951(a)

Count Three charges the Defendant with committing or aiding and abetting the commission of the substantive offense of interfering with commerce by extortion. As explained above, it is a federal crime to extort something from someone else and in doing so to obstruct, delay, or affect interstate commerce.

The Defendant can be found guilty of this crime only if all the following facts are proved beyond a reasonable doubt:

(1)    the Defendant caused Client B (Andy Tong) to part with property;

(2)    the Defendant did so knowingly by using extortion or extortion under color of official right; and

(3)    the extortionate transaction delayed, interrupted, or affected interstate commerce.

"Property" includes money, other tangible things of value, and intangible rights that are a source or part of income or wealth.

"Extortion" means obtaining property from a person who consents to give it up because of the wrongful use of actual or threatened force, violence, or fear. "Fear" means a state of anxious concern, alarm, or anticipation of harm. It includes the fear of financial loss as well as fear of physical violence.

Extortion under color of official right" is the wrongful taking or receipt of money or property by a public officer who knows that the money or property was taken or received in return for doing an official act. It does not matter whether or not the public officer employed force, threats, or fear. To qualify as an official act, the public official must have made a decision or taken an action, or agreed to make a decision or take an action on a question, matter, cause, suit, proceeding, or controversy.

Further, the question, matter, cause, suit, proceeding, or controversy must involve the formal exercise of governmental power. It must be similar in nature to a lawsuit before a court, a determination before an agency, or a hearing before a committee. It must also be something specific which requires particular attention by a public official.

The public official's decision or action or agreement to make a decision or take an action on that question, matter, cause, suit, proceeding, or controversy may include using his official position to exert pressure on another official to perform an official act, or to advise another official, knowing or intending that such advice will form the basis for an official act by another official. But setting up a meeting, talking to another official, or organizing an event (or agreeing to do so) – without more – is not an official act. It is not necessary that the public official actually make a decision or take an action. It is enough that he agrees to do so. The agreement need not be explicit, and the public official need not specify the means he will use to perform his end of the bargain. Nor must the public

official in fact intend to perform the official act, so long as he agrees to do so.

"Wrongful" means to get property unfairly and unjustly because the person has no lawful claim to it.

"Interstate commerce" is the flow of business activities between one state and anywhere outside that state.

The Government does not have to prove that the Defendant specifically intended to affect interstate commerce in any way. But it must prove that the natural consequences of the acts described in the indictment would be to somehow delay, interrupt, or affect interstate commerce. If you decide that there would be any effect at all on interstate commerce, then that is enough to satisfy this element.

The effect can be minimal. This element can be met when the object includes the movement of money between states and when the origin of the extortionate funds is fictional.

APPENDIX C

GOVERNMENT'S REQUESTED JURY INSTRUCTION NO. 17

S7

Aiding and Abetting; Agency 18 U.S.C. § 2

It's possible to prove the Defendant guilty of a crime even without evidence that the Defendant personally performed every act charged.

Ordinarily, any act a person can do may be done by directing another person, or "agent." Or it may be done by acting with or under the direction of others.

A Defendant "aids and abets" a person if the Defendant intentionally joins with the person to commit a crime.

A Defendant is criminally responsible for the acts of another person if the Defendant aids and abets the other person. A Defendant is also responsible if the Defendant willfully directs or authorizes the acts of an agent, employee, or other associate.

But finding that a Defendant is criminally responsible for the acts of another person requires proof that the Defendant intentionally associated with or participated in the crime – not just proof that the Defendant was simply present at the scene of a crime or knew about it.

In other words, you must find beyond a reasonable doubt that the Defendant was a willful participant and not merely a knowing spectator.

60                          Opinion of the Court                        22-13569

## APPENDIX D
## JURY INSTRUCTION NO. 21

You will note that, in Count Three, the Defendant is charged with aiding and abetting the commission of the alleged crime. It is possible to prove the Defendant guilty of a crime even without evidence that the Defendant personally performed every act charged.

Ordinarily, any act a person can do may be done by directing another person, or "agent." Or it may be done by acting with or under the direction of others. A defendant "aids and abets" a person if the defendant intentionally joins with the person to commit a crime.

A defendant is criminally responsible for the acts of another person if the defendant aids and abets the other person. A defendant is also responsible if he willfully directs or authorizes the acts of an agent, employee, or other associate.

But finding that the Defendant is criminally responsible for the acts of another person requires proof that the Defendant intentionally associated with or participated in the crime – not just proof that the Defendant was simply present at the scene of a crime or knew about it.

In other words, you must find beyond a reasonable doubt that the Defendant was a willful participant and not merely a knowing spectator.

APPENDIX E

O'STEEN'S REQUESTED JURY INSTRUCTION FOR COUNT
THREE

The Defendant is charged in count three of the indictment with aiding and abetting violation of Title 18, United States Code Section 1951(a) in violation of Title 18, United States Code Section 2. Section 1951(a) makes it a Federal crime to extort something from someone else and in doing so to obstruct, delay, or affect interstate commerce.

The Defendant can be found guilty of this crime only if all the following facts are proved beyond a reasonable doubt:

(1)  Jeffrey Alan Siegmeister caused Client B (Andy Tong) to part with property;

(2)  Jeffrey Alan Siegmeister did so knowingly by using extortion under color of official right;

(3)  the extortionate transaction delayed, interrupted, or affected interstate commerce; and

(4)  the Defendant aided and abetted Siegmeister in doing so.

"Property" includes money, other tangible things of value, and intangible rights that are a source or element of income or wealth.

"Extortion under color of official right" is the wrongful

taking or receipt of money or property by a public officer who knows that the money or property was taken or received in return for doing an official act. It does not matter whether or not the public officer employed force, threats, or fear.

To qualify as an official act, the public official must have made a decision or taken an action on a question, matter, cause, suit, proceeding, or controversy. Further, the question, matter, cause, suit, proceeding, or controversy must involve the formal exercise of governmental power. It must be similar in nature to a lawsuit before a court, a determination before an agency, or a hearing before a committee. It must also be something specific which requires particular attention by a public official.

The public official's action on that question, matter, cause, suit, proceeding, or controversy may include using his official position to exert pressure on another official to perform an official act, or to advise another official, knowing or intending that such advice will form the basis for an official act by another official. But setting up a meeting, talking to another official, or organizing an event (or agreeing to do so) - without more - is not an official act.

"Wrongful" means to get property unfairly and unjustly because the person has no lawful claim to it.

"Interstate commerce" is the flow of business activities between one state and anywhere outside of that state. The Government doesn't have to prove that the Defendant specifically intended to affect interstate commerce in any way. But it must prove

that the natural consequences of the acts described in the indictment would be to somehow delay, interrupt, or affect interstate commerce. If you decide that there would be any effect at all on interstate commerce, then that is enough to satisfy this element. The effect can be minimal.

Count three charges that the Defendant aided and abetted Jeffrey Alan Siegmeister in committing this crime. Title 18, United States Code Section 2 makes it a crime to aid and abet another in the commission of an offense against the United States. It is possible to prove the Defendant guilty of this crime by aiding and abetting Siegmeister even without evidence that the Defendant personally performed every act charged. Ordinarily, any act a person can do may be done by directing another person, or "agent." Or it may be done by acting with or under the direction of others.

A Defendant "aids and abets" a person if the Defendant intentionally joins with the person to commit a crime. A Defendant is criminally responsible for the acts of another person if the Defendant aids and abets the other person.

A Defendant is also responsible if the Defendant willfully directs or authorizes the acts of an agent, employee, or other associate. But finding that a Defendant is criminally responsible for the acts of another person requires proof that the Defendant intentionally associated with or participated in the crime—not just proof that the Defendant was simply present at the scene of a crime or knew about it. In other words, you must find beyond a

reasonable doubt that the Defendant was a willful participant and not merely a knowing spectator.

22-13569          JORDAN, J., Concurring                    1

JORDAN, Circuit Judge, joined by LAGOA, Circuit Judge, as to Parts
I, II, and III, Concurring in Part and Concurring in the Judgment.

I join Parts I.A, I.B, I.C, I.E, and I.F.iii of the court's opinion,
as well as Parts II and III, and otherwise concur in the judgment. I
agree that Mr. O'Steen's convictions on Counts Three and Four
must be reversed due to insufficient evidence. Although the
court's rationale as Counts Three and Four is legally sufficient, I
think the discussion should contain additional analysis. I therefore
write separately.

**I**

As relevant here, the Hobbs Act, 18 U.S.C. § 1951(a), makes
it a felony for someone to "obstruct[ ], delay[ ], or affect[ ] com-
merce or the movement of any article or commodity in commerce,
by robbery or extortion," or to "attempt[ ] or conspire[ ]" to do so.
Extortion "means the obtaining of property from another, with his
consent, induced by wrongful use of actual or threatened force, vi-
olence, or fear, or under color of official right." § 1951(b)(2).

Count Three charged both Mr. Siegmeister and Mr. O'Steen
(correctly or incorrectly) with committing the substantive offense
of extortion under color of official right and through fear of eco-
nomic harm. We have described the color of official right and fear
of economic harm theories of extortion as "alternative means" of
proving a § 1951(a) offense. *See United States v. Harris*, 916 F.3d 948,
951, 957 (11th Cir. 2019). Count Three also charged Mr. Siegmeis-
ter and Mr. O'Steen (correctly or incorrectly) with aiding and

abetting each other in the commission of the alleged substantive extortion offense.  *See* 18 U.S.C. § 2.[1]

I agree with the court that Count Three was not a model of good draftsmanship.  For example, if the government was going to charge that Mr. Tong was extorted by color of official right, Mr. Siegmeister was the only public official who could carry out that type of extortion.  As our sister circuits have recognized, a private person generally cannot be convicted of the substantive offense of extortion under color of official right.  *See Bianchi v. United States*, 219 F.2d 182, 193–94 (8th Cir. 1955); *United States v. Kenny*, 462 F.2d 1205, 1229 (3d Cir. 1972); *United States v. McLain*, 934 F.2d 822, 831 (7th Cir. 1991); *United States v. Tomblin*, 46 F.3d 1369, 1383 (5th Cir. 1993); *United States v. Saadey*, 393 F.3d 669, 674 (6th Cir. 2005).  Accordingly, only Mr. Siegmeister should have been charged with the substantive offense of extortion under color of official right.  And Mr. O'Steen could only have been charged with aiding and abetting Mr. Siegmeister's extortion under color of official right.  *See, e.g., United States v. Collins*, 78 F.3d 1021, 1031 (6th Cir. 1996) (citing cases from the Second, Fourth, and Fifth Circuits and explaining

---

[1] Count Three also contained boilerplate language stating that Mr. Siegmeister and Mr. O'Steen attempted to commit extortion, but the jury was not instructed on attempt and the government did not ask the jury to convict Mr. O'Steen on an attempt theory with regard to his representation of Mr. Tong. *See* D.E. 174 at 9–21 (government's closing argument on Count Three); D.E. 247 at 54 (jury instructions: "Count Three charges the defendant with committing or aiding and abetting the commission of the substantive offense of interfering with commerce by extortion.").

22-13569                 JORDAN, J., Concurring                 3

that "a private person can be convicted of aiding and abetting a public official who extorts under color of official right").[2]

As the court notes, the jury found Mr. O'Steen guilty of Count Three. On the verdict form the jury indicated that it found that he had committed both extortion and extortion under color of official right.

## A

In his Rule 29 motion as to Count Three, Mr. O'Steen argued that there can be no substantive extortion offense under § 1951(a)—under either theory—if all of the money taken from the victim was provided by a government law enforcement agency like the FBI. Here is what Mr. O'Steen told the district court:

> As to Counts Two and Three, the Hobbs Act requires . . . [that] the extortion must be of property . . . obtained from the victim. The property was the $60,000 sting money the government provided. And this is not a preservation-only argument; this is an argument for your consideration. I did a diligent search, Judge. I could not find any case law on this. My argument is that the property for extortion for [the] Hobbs Act must be actual property of the victim. And I could

---

[2] In its closing argument the government did not mention the color of official right theory and asserted that Mr. Siegmeister had aided and abetted Mr. O'Steen's extortion of Mr. Tong. *See, e.g.,* D.E. 174 at 16–17 ("[Mr.] Siegmeister knew the amount that [Mr.] O'Steen stood to gain. And he agreed to help his friend and his former colleague who helped him get the elected position extract that $60,000 from [Mr.] Tong.").

find no law to the contrary.  That would only be as to Counts Two and Three.

D.E. 170 at 8–9.

The district court rejected this argument at the end of trial. It explained that the "Hobbs Act defines extortion as obtaining property from another.  It doesn't say that it has to be property belonging to that person or belonging to another.  It's just obtaining property from another. . . . I didn't find any case law that presented the formulation of the elements of Hobbs Act extortion to require that the property to be taken be the property belonging to the [victim]."  D.E. 172 at 5–6 (relying in part on *United States v. Eaves*, 877 F.2d 943 (11th Cir. 1989)).

In his initial brief, Mr. O'Steen mentions this argument again, though briefly: "In this case, the Government's evidence failed to establish that Mr. O'Steen's [acquisition] of Mr. Tong's property was induced by the wrongful use of fear of economic harm. As a preliminary matter, Mr. Tong had no fear of losing the $60,000 that was paid to Mr. O'Steen.  The $60,000 was not Mr. Tong's money—it was the FBI's money."  Appellant's Br. at 30.

Because "we liberally read briefs to ascertain the issues raised on appeal," *United States v. Starke*, 62 F.3d 1374, 1379 (11th Cir. 1995), I agree with the court that Mr. O'Steen sufficiently presented the issue in his brief.  *See Silva v. Dos Santos*, 68 F.4th 1247, 1259 n.11 (11th Cir. 2023) (per curiam); *Cole v. U.S. Att'y Gen.*, 712 F.3d 517, 530–31 (11th Cir. 2013), *abrogated on other grounds by Nasrallah v. Barr*, 590 U.S. 573 (2020).  He did not present any

authorities in support, but that is understandable given that no one was able to find any cases on point.

The "relevant question" for sufficiency "is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). I turn now to whether a substantive extortion offense under § 1951(a) can be proven when the money the victim gives to the defendant comes completely from the FBI.

**B**

Under the Hobbs Act, "[o]btaining property requires 'not only the deprivation but also the acquisition of property.' That is, it requires that the victim 'part with' his property, and that the extortionist 'gain possession' of it[.]" *Sekhar v. United States*, 570 U.S. 729, 734 (2013) (citations omitted).

We have held that "a substantive Hobbs Act violation requires an actual effect on interstate commerce," while explaining that the "requisite effect on interstate commerce need not be substantial—all that is required is minimal impact." *United States v. Diaz*, 248 F.3d 1065, 1084 (11th Cir. 2001) (citation omitted). Though the "Hobbs Act usually is applied to robberies of businesses, criminal acts directed toward individuals also may violate the Hobbs Act." *Id.* "Robberies or extortions perpetrated upon individuals are prosecutable under the Hobbs Act when any one of the following three conditions are met: (1) the crime depletes the assets of an individual who is directly engaged in interstate

commerce; (2) the crime causes the individual to deplete the assets of an entity engaged in interstate commerce; *or* (3) the number of individuals victimized or the sums involved are so large that there will be a cumulative impact on interstate commerce." *Id.* at 1084–85 (citation omitted).

The parties and the district court indicated that they were unable to find any cases addressing whether the government can prove a substantive extortion offense under § 1951(a) when all of the money given by the victim to the defendant is completely provided by the government. There is, however, a Sixth Circuit case directly on point.

In *United States v. DiCarlantonio*, 870 F.2d 1058 (6th Cir. 1989), a city attorney and city fire chief were convicted of both conspiracy to commit extortion and the substantive offense of extortion. They had demanded payment from a local lawyer to facilitate the placing of propane tanks within the city limits by that lawyer's client. The lawyer and his client told the FBI about the demand, and the FBI provided them with $30,000. The lawyer and the client then gave the $30,000 to the city attorney and the city fire chief. No funds given to the city attorney and the city fire chief came from the assets of the lawyer, his client, or the client's company. *See id.* at 1059–60.

The Sixth Circuit affirmed the conspiracy convictions of the defendants but set aside their substantive extortion convictions. Because all of the money given to the defendants came from the

22-13569                    JORDAN, J., Concurring                    7

FBI, the requisite effect on commerce needed for a substantive vio-
lation of § 1951(a) violation was missing:

> In order to be punishable as a substantive vio-
> lation of the Hobbs Act, an extortionate scheme must
> have at least a *de minimis* effect on interstate com-
> merce. This is not a heavy burden, but we conclude
> that this is one of the rare cases where a *de minimis*
> effect on commerce cannot be found.
>
> The *de minimis* test clearly would have been
> satisfied if Glaub [the lawyer's client] had paid the
> bribe with the assets of Atlas Gas—a business in inter-
> state commerce. However, Glaub used neither his
> own funds nor those of the company; instead, the
> bribe money was provided by the FBI. The govern-
> ment now argues that the payment of $30,000 in FBI
> funds affected interstate commerce by temporarily
> depleting the funds available to the agency. But while
> courts have found actual violations of the Hobbs Act
> where the defendant dealt with an FBI-created busi-
> ness, the mere receipt of government funds has never
> been enough to establish an actual effect on interstate
> commerce.

*Id.* at 1060 (citations and footnotes omitted). In response to the
government's protest that such a ruling "would hamper law en-
forcement by requiring victims to use their own money even when
cooperating with the authorities," the Sixth Circuit explained that
in cases where the FBI (or another law enforcement agency) pro-
vides all of the money that is paid by the victim, the government

can charge the defendant with attempt to commit extortion. *See id.* at 1061.

A number of other circuits, in the course of upholding convictions for conspiracy to commit extortion or attempted extortion where the money paid by the victim was completely provided by a law enforcement agency, have agreed with the reasoning in *DiCarlantonio*. Their decisions explain that, unlike a substantive extortion offense, the inchoate extortion offenses of conspiracy and attempt can be charged and proven even where the government provides all of the money that the victim gives to the defendant. *See United States v. Jannotti*, 673 F.2d 578, 591–94 (3d Cir. 1982) (en banc) (conspiracy); *United States v. Shields*, 999 F.2d 1090, 1097–98 (7th Cir. 1993) (attempt); *United States v. Foster*, 443 F.3d 978, 983–84 (8th Cir. 2006) (attempt); *United States v. Watkins*, 691 F.3d 841, 849–50 (6th Cir. 2012) (attempt).

Our cases likewise differentiate between inchoate and substantive extortion offenses. *See, e.g., United States v. Carcione*, 272 F.3d 1297, 1300 n.5 (11th Cir. 2001) (explaining that, when the charge is conspiracy to commit extortion under the Hobbs Act, "the interstate nexus may be demonstrated by evidence of potential impact on interstate commerce, or by evidence of actual *de minimis* impact," but a "substantive violation of the Hobbs Act requires an actual, *de minimis* [e]ffect on commerce"). As far as I can tell from my own research, no circuit has upheld a substantive Hobbs Act conviction where the money given to the defendant was wholly provided by a law enforcement agency.

22-13569          JORDAN, J., Concurring          9

The Sixth Circuit's decision in *DiCarlantonio* is persuasive and makes sense to me. The jurisdictional hook of § 1951(a) is an effect on commerce. *See Stirone v. United States*, 361 U.S. 212, 218 (1961) ("The charge that interstate commerce is affected is critical since the Federal Government's jurisdiction of this crime [extortion] rests only on that interference."). And a substantive extortion offense requires proof of an actual (albeit a *de minimis*) effect on commerce. *See Diaz*, 248 F.3d at 1084; *Carcione*, 272 F.3d at 1300 n.5. Extortion, moreover, "requires that the victim 'part with' *his* property, and that the extortionist 'gain possession' of it." *Sekhar*, 570 U.S. at 734 (emphasis added).

If an agency like the FBI provides all of the money that the victim gives to the defendant, it cannot be said that the charged extortion "depletes the assets of an individual who is directly engaged in interstate commerce" or "causes the individual to deplete the assets of an entity engaged in interstate commerce." *Diaz*, 248 F.3d at 1084–85. Because the FBI gave Mr. Tong the money he then paid to Mr. O'Steen, the government's evidence on Count Three was insufficient as a matter of law.[3]

---

[3] The district court observed that the text of § 1951(b)(2) ("the obtaining of property from another") does not require that the property provided to the defendant belong to the victim himself. It may be that, for a substantive extortion offense, the money or property paid to the defendant can come from a third party or intermediary and not the victim himself. But the Eleventh Circuit cases cited in the text require an actual (if *de minimis*) effect on commerce for a substantive Hobbs Act violation, and there is no effect on

10                    Jordan, J., Concurring                    22-13569

## C

The district court, in denying Mr. O'Steen's Rule 29 motion on Count Three, relied in part on the Eleventh Circuit's decision in *Eaves*, 877 F.2d at 946. That reliance, though understandable, was misplaced.

In *Eaves* the defendant, a county commissioner, was convicted of three Hobbs Act violations (Counts One, Three, and Four) for receiving several payments in exchange for his favorable vote on matters that came before the county commission. Some of the money paid to the defendant came from the victim, and some came from the FBI. *See* 877 F.2d at 944–45.

Count One in *Eaves* charged the defendant with receiving $5,000 from the victim's own funds. *See* 877 F.2d at 945 ("On June 19, Al Johnson [the intermediary of the victim, Charles Wood] paid Eaves [the defendant] $5,000 in cash. . . . Count [One] charged that Eaves accepted a $5,000 payment from Charles Wood."). When the defendant contested the guilty verdict on Count One, the *Eaves* panel rejected the challenge and explained that the jurisdictional nexus had been established. There had been an actual *de minimis* effect on commerce because the victim (and/or his company) had made a number of payments to the defendant, including a payment of $5,000. *See id.* at 946.

---

commerce if only the government's money or property is given to the defendant. *See Diaz*, 248 F.3d at 1084–85.

The defendant in *Eaves* also argued that there was insufficient evidence on Counts Three and Four because the entire "project" presented to him for his vote was fictitious, and as a result there could be no effect on commerce. The panel turned aside this argument as well, reasoning that Counts Three and Four charged the defendant with the inchoate offense of attempted extortion. *See id.* ("This argument has been soundly rejected and we follow suit."). The panel cited a prior Eleventh Circuit case, *United States v. Holmes*, 767 F.2d 820, 823, 824–25 (11th Cir. 1985), which had upheld a real estate agent's convictions for conspiracy to commit extortion and attempted extortion where an FBI agent had posed as a fictitious victim for a fake development project and was told that he had to funnel money to the city mayor through the real estate agent. *See Eaves*, 877 F.2d at 946.[4]

Our decision in *Eaves* is consistent with the Sixth Circuit's decision in *DiCarlantonio*. The substantive Hobbs Act convictions in both cases were supported by evidence that the victim had paid the defendant from his own funds, and as a result there was an actual (if *de minimis*) effect on commerce. *See DiCarlantonio*, 870 F.2d at 1060–61; *Eaves*, 877 F.2d at 944–46.

---

[4] The panel in *Holmes* said that "[t]he fact that the FBI undercover agent represented a fictitious business entity is not a defense to an extortion charge." 767 F.2d at 824. But language in cases must always be read in light of the facts presented. The statement quoted above applies only to the inchoate Hobbs Act offenses at issue in that case (*i.e.*, conspiracy and attempt), and does not extend to substantive extortion offenses.

**D**

As a reminder, Count Three charged Mr. Siegmeister and Mr. O'Steen with a substantive extortion offense relating to Mr. Tong (and the aiding and abetting of that offense), but not with conspiracy to commit extortion or attempted extortion. Given that a substantive extortion offense requires an actual (if *de minimis*) effect on commerce, such an offense cannot be proven when all of the money the victim paid to the defendant was provided by the FBI. *See DiCarlantonio*, 870 F.2d at 1060. Application of this principle leads to the inevitable conclusion that the evidence on Count Three was legally insufficient because the $60,000 that Mr. Tong gave to Mr. O'Steen was provided by the FBI. Mr. O'Steen may have behaved badly, or unethically, but under *DiCarlantonio* he is entitled to a judgment of acquittal on Count Three.[5]

---

[5] I recognize that Mr. O'Steen has only requested a new trial on Count Three. *See* Appellant's Br. at 14, 56. But his requested remedy does not limit our authority to rule that he is entitled to a judgment of acquittal on Count Three. *See* 28 U.S.C. § 2106 ("The Supreme Court or any other court of appellate jurisdiction may affirm, modify, vacate, set aside or reverse any judgment, decree, or order of a court lawfully brought before it for review, and may remand the cause and direct the entry of such appropriate judgment, decree, or order, or require such further proceedings to be had as may be just under the circumstances."). *See Bryan v. United States*, 175 F.2d 223, 229 (5th Cir. 1949) (per curiam) (on rehearing) (relying in part on § 2106 to enter judgments of acquittal in favor of the defendant in a criminal case after initially remanding for a new trial).

## II

I also agree with the court that Mr. O'Steen's conviction on Count Four must be set aside due to insufficient evidence.  But I think the government's evidence is even weaker than the court indicates.

Count Four charged Mr. O'Steen with violating 31 U.S.C. §§ 5331 & 5322 by willfully failing to file a Form 8300 with the Financial Crimes Enforcement Network within 15 days of receiving the $60,000 in currency from Mr. Tong.  *See* 31 C.F.R. § 1010.330(e)(1) (incorporating the 15-day filing requirement from 26 C.F.R. § 1.6050I-1(e)(1)).  Critically, the underlying criminal statute requires a showing of willfulness.  *See* 31 U.S.C. § 5322(a)–(b) (both subsections using the phrase "willfully violating").

Mr. O'Steen moved for a judgment of acquittal on Count Four, arguing in part that the government failed to prove beyond a reasonable doubt that he knew about the 15-day filing requirement.  *See* D.E. 170 at 10–12, 14–15.  And he now makes that same argument on appeal.  *See* Appellant's Br. at 44–49.

The evidence at trial showed that Mr. O'Steen filed a Form 8300 eight months after the receipt of the money.  The Count Four violation, therefore, was not based on a complete failure to file the Form 8300; it was instead based on the failure to file the Form 8300 within the 15-day window prescribed by the applicable regulation.

As the court explains, the government had to prove—by direct or circumstantial evidence—that Mr. O'Steen knew about the 15-day requirement.  *See United States v. Granda*, 565 F.2d 922, 925–

26 (5th Cir. 1978) (holding that the former 31 U.S.C. §§ 1058 & 1101, which mandated that travelers transporting or receiving more than $5,000 in currency file a report with the government, and which established criminal penalties for those who willfully failed to file such a report, "require[d] proof of the defendant's knowledge of the reporting requirement and his specific intent to commit the crime"). Indeed, the jury instructions here explained the 15-day filing requirement as set out in the regulations, and required the government to prove, among other things, that Mr. O'Steen "acted willfully," i.e., that "he had knowledge of the currency transaction reporting requirements and failed to file a Form 8300 for the purpose of evading those requirements." D.E. 247 at 59–60.

The government, in my view, may have presented sufficient evidence that Mr. O'Steen knew at some point that he had to report the receipt of more than $10,000 in currency. For example, Mr. O'Steen filed a Form 8300, albeit months after receipt of the cash from Mr. Tong. And he attended a CLE course where participants were told that attorneys had to report cash payments of over $10,000.

But the government did not prove beyond a reasonable doubt that Mr. O'Steen knew that he had to submit the Form 8300 *within 15 days of receipt* of the cash from Mr. Tong. It did not show, in other words, that he "acted with knowledge of the reporting requirements." *Granda*, 565 F.2d at 926. As set out below, the circumstantial evidence presented by the government was,

individually and collectively, woefully insufficient with respect to Mr. O'Steen's knowledge of the 15-day filing requirement.

First, the excerpt the government presented from the CLE course Mr. O'Steen attended says nothing whatsoever about the 15-day filing requirement. Those who attended the course were told only that they had to report cash receipts of over $10,000. They were not told *when* those reports had to be made. *See* Court Ex. 113A. If the CLE course did not alert attendees about the 15-day filing requirement, Mr. O'Steen could not have learned about that requirement from the course. A "jury may infer knowledge and criminal intent from circumstantial evidence alone," but the inference must be reasonable and cannot be based on "mere speculation." *United States v. Duenas*, 891 F.3d 1330, 1334 (11th Cir. 2018).

Second, the jury could not reasonably find that Mr. O'Steen knew about the 15-day filing requirement based on evidence that (a) he wrote two checks for $9,999.99 to the same payee; and (b) he deposited $9,900 in cash and asked the teller how long before the government found out. These transactions are relevant to the *obligation of a bank* to file a currency transaction report when a customer executes a transaction involving more than $10,000. *See* 31 U.S.C. §§ 5313 & 5324(a); 31 C.F.R. § 1010.311. They do not concern the separate obligation of a person (like Mr. O'Steen) involved in a trade or business to report cash receipts of over $10,000 to the Financial Crimes Enforcement Network. Although a customer cannot knowingly and willfully structure his financial transactions

to cause a bank to not file a currency transaction report, *see United States v. Bird*, 79 F.4th 1344, 1346–47 (11th Cir. 2023), Mr. O'Steen was not charged in Count Four with structuring. He was charged only with failing to file a Form 8300 within 15 days of receiving the money from Mr. Tong.

Third, Mr. O'Steen's refusal of a pamphlet containing information about currency transaction reports—offered to him by a bank teller—cannot save the guilty verdict on Count Four. Mr. O'Steen, according to the teller, declined the pamphlet because he said he knew what was in it. But this pamphlet only explained a *bank's obligation* to file a currency transaction report and did not discuss the separate obligation of a person like Mr. O'Steen to file a Form 8300 with the Financial Crimes Enforcement Network. *See* Court Ex. 104. So when Mr. O'Steen told the teller that he knew what was in the pamphlet, the most that can be inferred from that statement is that he knew about a *bank's obligation* to file a currency transaction report when a customer executes a transaction involving more than $10,000.

Fourth, the fact that Mr. O'Steen filed an untimely Form 8300 eight months after he received the money from Mr. Tong cannot (alone or in combination) prove his knowledge of the 15-day filing requirement at the time of receipt. To conclude otherwise would mean that a jury could always infer knowledge of the 15-day filing requirement from an untimely filing. Such an inference would be based on "mere speculation" and would therefore be unreasonable. *See Duenas*, 891 F.3d at 1334.

22-13569          JORDAN, J., Concurring          17

Taken collectively, all of this circumstantial evidence fares no better.  As the D.C. Circuit has said in a different context, "in law as in mathematics zero plus zero equals zero."  *Henderson v. Kennedy*, 253 F.3d 12, 19 (D.C. Cir. 2001).

**III**

I agree that we must set aside Mr. O'Steen's convictions on Counts Three and Four for lack of sufficient evidence.

22-13569         TJOFLAT, J., Specially Concurring         1

TJOFLAT, Circuit Judge, specially concurring:

I write separately to provide an additional rationale for reversal on Count Three.

On appeal, O'Steen argues that the Government failed to prove that he obtained $60,000 of Tong's money "with his consent, induced by wrongful use of actual or threatened . . . fear." 18 U.S.C. § 1951(a) (**Count 3**). Specifically, the Government failed to prove that Tong consented to give him $60,000 because of his *wrongful* use of actual or threatened force, violence, or fear.[1] The Government's response is that O'Steen's request for an additional $60,000 was wrongful because the fee was excessive and impermissibly contingent in violation of the Rules Regulating the Florida Bar.[2]

The Supreme Court and Courts of Appeals have spoken to the meaning of the word "wrongful" in Hobbs Act extortion. In *United States v. Enmons*, union members were striking and using physical violence to force their employer to agree to a contract calling for higher wages and benefits. 410 U.S. 396, 397–398, 93 S. Ct. 1007, 1008 (1973). They were charged with Hobbs Act conspiracy to obtain property wrongfully by force or violence. *Id.* The District

---

[1] "'Fear' means a state of anxious concern, alarm, or anticipation of harm. It includes the fear of financial loss." The District Court's Instruction No. 19, in defining "extortion," adopted the definition set out in Eleventh Circuit Pattern Jury Instruction O70.1.

[2] I have difficulty envisioning a Hobbs Act prosecution based on a lawyer's charging of a contingent fee, no matter the amount. I therefore treat an "excessive and impermissibly contingent" fee as an "excessive" fee.

Court dismissed the charge. *Id.* at 398, 93 S. Ct. at 1008–09. In its view,

> [i]f "the wages sought by violent acts are wages to be paid for unneeded or unwanted services, or for no services at all," then that violence would constitute extortion within the meaning of the Hobbs Act. But in this case, by contrast, . . . the indictment alleged the use of force to obtain legitimate union objectives: "The union had a right to disrupt the business of the employer by lawfully striking for higher wages. . . . To punish persons for such acts of violence was not the purpose of the Hobbs Act."

*Id.*

In affirming the dismissal, the Supreme Court emphasized that the use of force, violence, or fear to obtain property must be "wrongful" to constitute Hobbs Act extortion. *Id.* at 399–400, 93 S. Ct. at 1009–10. The Court explained that "'wrongful' has meaning in the Act only if it limits the statute's coverage to those instances where the obtaining of the property would itself be 'wrongful' because the alleged extortionist *has no lawful claim* to that property." *Id.* (emphasis added). The Court reasoned that the union's actions in that case did not violate the Hobbs Act, because the union sought "to achieve legitimate union objectives, such as higher wages in return for genuine services which the employer seeks." *Id.*

In *Brokerage Concepts,* the Third Circuit interpreted *Enmons* to hold "that a defendant is not guilty of extortion if he has a lawful claim to the property obtained." *Brokerage Concepts, Inc. v. U.S.*

22-13569          TJOFLAT, J., Specially Concurring          3

*Healthcare, Inc.*, 140 F.3d 494, 523 (3d Cir. 1998). The Court high-lighted cases in which "the defendant is legally entitled to the prop-erty obtained from the victim since he has provided real value in exchange for that property, and the victim has no preexisting right to be free of the fear he is quelling in return for his payment to the defendant." *Id.* at 525.

In *Rennell,* a case alleging the wrongful termination of a joint-venture agreement, the Seventh Circuit similarly based its analysis on whether the defendant had a "claim of right" to the purported victim's property:

> If a defendant has no claim of right to the property, the use of fear to obtain that property—including the fear of economic loss—may also amount to extor-tion. In contrast, where the defendant has a claim of right to property and exerts economic pressure to ob-tain that property, that conduct is not extortion and no violation of the Hobbs Act has occurred.

*Rennell v. Rowe*, 635 F.3d 1008, 1012 (7th Cir. 2011).

The Third Circuit found that Rennell's extortion claim was not valid, because Rowe "had a right to terminate the joint-venture agreement" and "was engaged in nothing more than unpleasant hard dealing." *Id.* at 1013–14. In the Court's view, if Rennell thought Rowe's conduct was unlawful, Rennell had easy recourse through state-law tort and contract claims:

> We realize that Rennell believes that Rowe dealt badly with him. We take Rennell at his word that Rowe's actions amounted to economic duress. Rowe may

also have breached his duties under the contracts and acted in violation of the general duty of good faith and fair dealing, among other things. But those claims should be pursued through state-law theories of contract and, perhaps, tort—not civil RICO. We note as well that Rennell's state-law claims are still alive, because the district court dismissed them without prejudice when it relinquished its supplementary jurisdiction. The state courts are the right place to sort out this business dispute.

*Id.* at 1014.

Therefore, in my view, Count Three presents a breach of contract claim as an extortion claim and a Hobbs Act violation. The claim is rooted in a contract, the Retainer Agreement between O'Steen and Tong. Tong agreed to pay O'Steen "a reasonable fee for [the] work" O'Steen had undertaken to perform. The parties contemplated that the $5,000 retainer Tong paid would probably be insufficient to cover the work, so the Agreement gave O'Steen the right to charge Tong "an additional fee."[3] And Tong had an obligation to pay an additional fee if the fee was "reasonable." In exercising his right to charge an additional fee and in representing Tong, O'Steen was governed by "the rules regulating the Florida Bar," which included the rules Scott Richardson cited. Tong considered an additional fee of $60,000 unreasonable.

---

[3] The Retainer Agreement states: "This engagement fee is only a minimum fee and . . . an additional fee may be charged should the cost of services rendered exceed the retainer amount," $5,000.

22-13569          TJOFLAT, J., Specially Concurring          5

Like Rennell, who believed that Rowe had infringed his contract rights and caused him economic harm, Tong believes that O'Steen infringed his contract rights and caused him economic harm. And like Rennell, he can seek relief in state-law tort and contact actions. In fact, Tong has already taken that step, invoking diversity jurisdiction in the District Court below and suing O'Steen for legal malpractice. According to Scott Richardson, he can at least partially vindicate his rights in the form of a grievance filed with The Florida Bar and alleging the violation of its rules of practice.

I have considered whether there is any reason why "wrongful" should have a different meaning in the instant case than it had in *Rennell*. I find none. I note that lawyers represent individuals or entities pursuant to a contractual arrangement. In representing persons or entities accused of crime, lawyers must honor their clients Sixth Amendment right to the effective assistance of counsel. I can only imagine the chilling effect prosecuting lawyers under the Hobbs Act would have on the provision of counsel to those subject to criminal prosecution.

Therefore, I do not believe that the Government can sustain a prosecution under the Hobbs Act based on what amounts to a breach of an attorney-client contract. Since O'Steen, as the principal, committed none of the Hobbs Act offenses Count Three alleged (**Counts 3** and **4**) and, as an accomplice, did not aid and abet their commission (**Counts 7** and **8**), to affirm his Count Three conviction would work a manifest miscarriage of justice. I would

6                    TJOFLAT, J., Specially Concurring          22-13569

reverse the District Court on this basis, as well as the one announced in this Court's opinion.